FILED
United States Court of Appeals
Tenth Circuit

December 19, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MELISSA R. SCHWARTZ, as
Personal Representative and
Administrator of the Estate of
Chandler Grafner, deceased;
CHRISTINA GRAFNER; JOSHUA
NORRIS,

     Plaintiffs-Appellees,

v.

MARGARET BOOKER, in her
individual capacity; MARY
PEAGLER, in her individual capacity,

     Defendants-Appellants.

No. 11-1583

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:09-CV-00915-WJM-KMT)**

---

Robert A. Wolf, Denver City Attorney's Office, Human Resources Section
(Douglas J. Friednash, City Attorney; Niels Loechell and Linda Davison, Denver
City Attorney's Office, on the briefs), Denver, Colorado, for
Defendants-Appellants.

J. Kyle Bachus of Bachus & Schanker, LLC, Denver Colorado, for
Plaintiffs-Appellees.

---

Before **BRISCOE**, Chief Judge, **GORSUCH** and **MATHESON**, Circuit Judges.

**BRISCOE**, Chief Judge.

---

This is an interlocutory appeal from the denial of a motion to dismiss asserting qualified immunity. At issue is the scope of the special relationship doctrine and whether it would apply to the facts alleged to expose two human services employees to potential individual liability for the death of a seven-year-old child in foster care.[1]

After their son, Chandler Grafner, died while in the foster care of Jon Phillips and Sarah Berry, Chandler's biological parents, Christina Grafner and Joshua Norris, and Melissa R. Schwartz, personal representative and administrator of Chandler's estate, filed suit against two county human services departments and two employees alleging, among other claims, a 42 U.S.C. § 1983 claim for violation of Chandler's substantive due process rights. The two employees, Defendants-Appellants Margaret Booker and Mary Peagler, have filed this interlocutory appeal from the district court's order denying their Rule 12(b)(6) motion to dismiss on the basis of qualified immunity. We affirm.

---

[1] "Under the Supreme Court's collateral order doctrine, 'a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.'" Weise v. Casper, 507 F.3d 1260, 1263 (10th Cir. 2007) (citation omitted) (quoting Mitchell v. Forsyth, 472 U.S. 511, 530 (1985)).

I

*Factual Background*[2]

Over a period of almost three years, three Colorado county departments of human services were called upon to investigate possible abuse of Chandler as he transitioned between homes and caretakers. Sadly, none prevented his untimely death at the hands of his foster parents. This series of events began in October 2004, when Christina Grafner contacted Arapahoe County Department of Human Services (ACDHS) to express her fears that Jon Phillips, a man with whom she lived, would harm her son, Chandler Grafner. By September 2005, Christina and Chandler had moved in with Christina's mother, Sandra Younger. In December 2005, ACDHS created an open case regarding Chandler, which was ultimately referred to Jefferson County Department of Human Services (JCDHS) after Chandler and Christina relocated to Jefferson County. Rather than confirm Christina's address in Jefferson County, JCDHS referred Chandler's case back to ACDHS. On the same date, ACDHS closed Chandler's case.

On March 26, 2006, JCDHS opened a case regarding Chandler and removed Chandler from his mother's custody. By March 28, Chandler was in JCDHS's custody. In May 2006, JCDHS placed Chandler in Jon Phillips's home. JCDHS

---

[2] Facts are taken from plaintiffs' amended complaint. See Brown v. Montoya, 662 F.3d 1152, 1162 (10th Cir. 2011) (finding that when reviewing a district court's denial of a motion to dismiss based on qualified immunity, "'all well-pleaded factual allegations in the . . . complaint are accepted as true.'" (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

3

placed Chandler with Jon Phillips, who had no biological relationship to Chandler, in disregard of previous concerns of abuse voiced by Chandler's mother and without updating Chandler's case in the automated reporting system—a state-wide system used by Colorado state departments of human services to monitor cases. Thereafter, JCDHS added Sarah Berry, Jon Phillips's live-in girlfriend, as a special respondent in Chandler's foster care case.

Reports of possible abuse began on January 17, 2007, when a kindergarten teacher's aide, Amy Domanski, noticed red marks on Chandler's neck, a bump on his head, and swelling and redness in his right ear. When the aide asked Chandler about these injuries, he responded, "Dad kept slapping my ear in the shower. He smacked me in the neck and kept putting me in the water." Aplts. App. at 5. When questioned further by the assistant principal,[3] Maureen Hogan, Chandler responded that "[m]y daddy put me in the shower and slapped me in the ear over and over. He was mad at me because my little brother made me steal candy." Id. at 6. The assistant principal subsequently reported her suspicions of child abuse to Denver County Department of Human Services (DCDHS), which then referred her to JCDHS. The following day, JCDHS referred the reported child abuse to DCDHS citing Jon Phillips's and Sarah Berry's status as Denver County residents

---

[3] It is not clear whether Maureen Hogan was the assistant principal or the principal. Compare Aplts. App. at 26 ("Chandler was seen by school Principal Maureen Hogan."), with id. at 28 ("Maureen Hogan, assistant principal at Holm Elementary School . . . .").

as the basis for referral. JCDHS took no further action.

Two days after the reported abuse, on January 19, 2007, a DCDHS intake worker visited Chandler's school in an attempt to investigate Chandler's injuries, but was unable to do so due to Chandler's absence from school. The same day, Denver police attempted a welfare check at Chandler's home, but received no answer at the door. The following day, January 20, Denver police again conducted a welfare check at Chandler's home; this time, officers found Chandler and removed him from the home. Officers took Chandler to the Family Crisis Center to be evaluated by Denver Social Services. Upon questioning by the officers, Chandler initially informed them that his father had hit him, but later explained that he had fallen in the bathtub.

In response to questioning by the emergency-response caseworker at the crisis center, Chandler stated that he had to take showers when he misbehaved and that he had taken candy from the kitchen, so he had to take a shower. Chandler also told the emergency-response caseworker that he had to "eat nasty food" when he misbehaved. Id. at 7. In light of this discussion, the caseworker determined that Chandler's injuries were indicative of nonaccidental trauma.

DCDHS concluded otherwise and ruled that abuse was unfounded after a home visit by a caseworker. DCDHS returned Chandler to Jon Phillips and Sarah Berry's home later that day. Two days later, Denver police and DCDHS questioned Jon Phillips and Sarah Berry about the suspected abuse. In response

5

to this questioning, both denied abuse and reported that the school official's reports were retaliation. After returning to school, Chandler informed his teacher that his parents were mad at her because she was interrogating him and that he had just fallen in the shower. When asked if his parents told him to say that he had fallen, Chandler responded, "Yes, they did." Id. at 8. The day after this exchange, DCDHS caseworkers went to the school to interview school personnel. During this investigation, DCDHS caseworkers discovered that Chandler had been sent to school in December wearing only one shoe and no coat.

Throughout this period, Margaret Booker served as the head of Investigation of Child Maltreatment and Intake Services at DCDHS and was responsible for the investigation of Chandler's case. Mary Peagler was a case record supervisor at DCDHS and was also responsible for investigating Chandler's case. On February 7, 2007, Peagler closed Chandler's case regarding the January allegations of abuse.

Suspicions of abuse continued. Two months after the January 2007 investigation, Chandler told his teacher aide to "stop interrogating me. I get in so much trouble." Id. And, on April 17, 2007, Chandler's school informed DCDHS that Chandler had been withdrawn from school since March 9. Chandler's school also informed DCDHS that school staff made several unsuccessful attempts to reach Chandler's home during this period and that when they finally reached Jon Phillips, he explained that Chandler would be transferring schools due to "family

6

problems." Id. Overall, the personnel at Chandler's school filed at least four written complaints to DCDHS regarding Chandler's continued absence and suspected neglect and abuse. Despite the school's concerns, Booker and Peagler did not investigate the April referral and ultimately closed the case, contrary to the Colorado Department of Human Services' procedure requiring a within 24-hours response to suspicions of child abuse. On May 6, over three weeks after the April referral, Chandler was found in a locked closet in an emaciated state and taken from Jon Phillips's home; Chandler died later that day from cardiac arrest caused by severe dehydration and starvation.

*District Court Proceedings*

Melissa R. Schwartz, personal representative and administrator of Chandler's estate, Christina Grafner, Chandler's biological mother, and Joshua Norris, Chandler's biological father, filed the present suit against JCDHS, DCDHS, Margaret Booker, in her individual and official capacities, and Mary Peagler, in her individual and official capacities, asserting, among other claims, a § 1983 claim for violation of Chandler's substantive due process rights. The district court dismissed the claims against JCDHS, DCDHS, and Margaret Booker and Mary Peagler in their official capacities, after finding these defendants entitled to Eleventh Amendment immunity. Booker and Peagler also sought dismissal on the basis of qualified immunity of the § 1983 claim asserted against them in their individual capacities. After finding that Booker and Peagler were

7

not entitled to qualified immunity, the district court denied their motion to dismiss. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

II

Qualified immunity protects governmental officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is more than a defense to liability: It is "an immunity from suit" that "is effectively lost if a case is erroneously permitted to go to trial." Mitchell, 472 U.S. at 526 (emphasis omitted). Accordingly, qualified "immunity questions [should be resolved] at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

This court reviews de novo the denial of a motion to dismiss based on qualified immunity. Butler v. Rio Rancho Pub. Sch. Bd. of Educ., 341 F.3d 1197, 1199 (10th Cir. 2003). Accordingly, all well-pleaded allegations of the complaint are accepted as true and viewed in a light most favorable to the nonmoving party. To survive a motion to dismiss based on qualified immunity, the plaintiff must allege sufficient facts that show—when taken as true—the defendant plausibly

8

violated his constitutional rights, which were clearly established at the time of violation. Robbins v. Oklahoma, 519 F.3d 1242, 1249 (10th Cir. 2008). We first determine if the amended complaint sufficiently alleged violation of a constitutional right because "'[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.'" Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 841-42 (10th Cir. 2005) (alteration in original) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. 223).

III

*Substantive Due Process Claim*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Section 1983 provides a private cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Generally, state actors are only liable for their own acts, not for acts of private violence. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). Two exceptions exist to this general principle: The special relationship doctrine and state-created danger theory. Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). The special relationship doctrine applies "'when the state assumes control over an individual

9

sufficient to trigger an affirmative duty to provide protection to that individual.'"

J.W. v. Utah, 647 F.3d 1006, 1011 (10th Cir. 2011) (quoting Uhlrig v. Harder, 64

F.3d 567, 572 (10th Cir. 1995)). Broadly, the state-created danger theory applies

when the State creates or increases a harm of private violence to an individual.[4]

Armijo ex rel. Chavez v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1262-63 (10th

Cir. 1998). Only the special relationship doctrine is relevant to this appeal.

*Special Relationship*

The origin of this exception is the Supreme Court's decision of DeShaney

v. Winnebago County Department of Social Services, 489 U.S. 189 (1989). In

DeShaney, the Supreme Court concluded that "when the State takes a person into

its custody and holds him there against his will, the Constitution imposes upon it

---

[4] Specifically, a plaintiff must establish the following elements before the state-created danger theory applies:

> "1) Plaintiff was a member of a limited and specifically definable group; 2) Defendant's conduct put Plaintiff at substantial risk of serious, immediate, and proximate harm; 3) the risk was obvious or known; 4) Defendant acted recklessly in conscious disregard of that risk; . . . 5) such conduct, when viewed in total, is conscience shocking[;] [and 6)] defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way."

DeAnzona v. City & Cnty. of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000) (second alteration in original) (quoting Armijo, 159 F.3d at 1262-63). Affirmative conduct by the state actor and a private act of violence are preconditions to application of this exception. Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 920, 928 (10th Cir. 2012).

a corresponding duty to assume some responsibility for his safety and general well-being." 489 U.S. at 199-200. This duty, the Court explained, is not triggered by the "State's knowledge of the individual's predicament or from its expressions of intent to help him." Id. Rather,

> it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

Id. at 200. While the Court foreshadowed in DeShaney that such a right could extend to children in foster care,[5] it was not until Yvonne L. ex rel. Lewis v. New Mexico Department of Human Services, 959 F.2d 883 (10th Cir. 1992), that the Tenth Circuit explicitly recognized that foster children have a substantive due process right to "protection while in foster care." Id. at 892-93. Accordingly, foster care is recognized as one of the custodial relationships that creates a special relationship.

The special relationship triggers a continuing duty which is subsequently violated if a state official "knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative

---

[5] "Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." DeShaney, 489 U.S. at 201 n.9.

11

link to the injuries [the child] suffered can be shown." Id. at 890; see Gray, 672

F.3d at 923. Generally, the scope of this relationship has turned on the dependent

and involuntary nature of the custodial relationship between the individual and

the State. See Maldonado v. Josey, 975 F.2d 727, 732-33 (10th Cir. 1992)

(finding that state compulsory education laws did not create special relationship

because "school hour" custody did not "alter the fact that parents retain ultimate

responsibility for their child's food, shelter, clothing, medical care, and

reasonable safety"); Liebson, 73 F.3d at 276 (finding no special relationship when

relationship was consensual, employment relationship).

Booker and Peagler present two distinct, but similar, arguments as support

for their assertion that the special relationship doctrine does not presently apply:

First, they argue that neither of them personally participated in the placement of

Chandler and, therefore, did not deprive Chandler of his liberty; and, second, they

argue that only JCDHS had a special relationship with Chandler because it was

the state agency that initially placed Chandler in Jon Phillips's home.[6]

As support for their argument that the defendant-official's participation in

the foster child's placement is necessary to trigger liability, Booker and Peagler

exclusively rely upon cherry-picked language from a handful of Tenth Circuit

---

[6] Booker and Peagler also argue that the constitutional duty is limited to placement of the foster child. Since Yvonne L., however, it is clear that this right extends beyond initial placement to "protection while in foster care." 959 F.2d at 892-93; J.W., 647 F.3d at 1011.

12

cases.[7]  We find Booker and Peagler's reading of this cherry-picked language

flawed for several reasons.  First, their construction requires a literal reading

isolated from the context of the opinion.  As our case law makes clear, the special

relationship exists between the State and foster child, which triggers an

accompanying, continuing duty imposed on state custodial officials

thereafter—not a duty limited to only the specific officials who executed the

placement of the child.[8]  See, e.g., Gray, 672 F.3d at 923 ("[T]he State incurs an

---

[7]  Specifically, Booker and Peagler cite the following language and cases.
"[I]f the persons responsible place children in a foster home or institution that
they know or suspect to be dangerous to the children they incur liability if the
harm occurs. . . . The officials who place the children are acting in the place of
the parents."  Yvonne L., 959 F.2d at 893-94.  "A special relationship exists
between Redd and Brooks only if Brooks restrained Redd's freedom to act, so that
Redd was unable to protect himself."  DeAnzona, 222 F.3d at 1234.  "This court
has held that a plaintiff must show involuntary restraint by the government
official in order to establish a duty to protect under the special relationship
theory."  Armijo, 159 F.3d at 1261 (citing Liebson, 73 F.3d at 276).  "[I]t was
also clearly established that state officials had a duty to protect individuals whom
they had taken involuntarily into their physical custody and control."  Liebson, 73
F.3d at 277.

[8]  In their opening brief, Booker and Peagler seem to conflate their
argument for the official-participation requirement with the requirements of
establishing supervisor liability.  See Aplts. Br. at 9 (citing J.W. as "[r]ecognizing
that the supervisor 'was not responsible for the placement decision on which
Plaintiffs' claim is premised' and there was 'no evidence that the supervisor
personally participated or knowingly acquiesced in the alleged deprivations of
Plaintiffs' constitutional rights,' this Court held that the district court was correct
in holding that Plaintiffs 'have not set forth a valid basis for finding the
supervisor liable under a §1983 claim.'").  Moreover, Booker and Peagler's
citation to DeAnzona is unpersuasive:  the DeAnzona court upheld this court's
understanding that a special relationship exists if the individual is in an
involuntary, custodial relationship with the State and is not affected by the
individual's age; accordingly, the DeAnzona court unremarkably found a child at

13

antecedent constitutional duty to protect the victim" when a special custodial relationship exists between the two); J.W., 647 F.3d at 1011 ("Thus, the State owed [the foster children] the affirmative duty of protection while they were in foster care. . . . However, state officials will only be found to have violated this right if they 'knew of the asserted danger to [foster children] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the children] suffered can be shown.'" (second and third alterations in original) (emphases added) (citations omitted) (quoting Yvonne L., 959 F.2d at 890)); Johnson ex rel. Cano v. Holmes, 455 F.3d 1133, 1142-43 (10th Cir. 2006) ("They[, state officials], however, can be held liable for harm done by third parties if the state has a 'special relationship' with the harmed individual." (emphasis added)).[9]

Even the cases Booker and Peagler cite as support for their argument discuss the deprivation of a child's liberty by the State and the liability of state officials arising thereafter—an apparent inconsistency with their assertion that a

day camp does not satisfy such requirements because he remained in his parents' custody.  222 F.3d at 1234-35.

[9] This interpretation of the special relationship doctrine aligns with that of other circuits.  See, e.g., J.R. v. Gloria, 593 F.3d 73, 76, 80 (1st Cir. 2010) (applying doctrine to nonplacing official-defendants, but finding that conduct did not shock the conscience); Doe v. N.Y.C. Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981) ("When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." (emphasis added)).

14

defendant-state official is only potentially liable if responsible for a child's initial placement. DeAnzona, 222 F.3d at 1234 ("A plaintiff must show involuntary restraint by the government to have a claim under a special relationship theory, if there is no custodial relationship there can be no constitutional duty. . . . The state has a special relationship with only 'individuals depend[ent] completely on the state to satisfy their basic human needs.'" (alteration in original) (citations omitted) (quoting Maldonado, 975 F.2d at 732-33)); Armijo, 159 F.3d at 1261 ("[I]f the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint . . . ."); Liebson, 73 F.3d at 276 ("The first exception, known as the special relationship doctrine, 'exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual.'" (quoting Uhlrig, 64 F.3d at 572)); Yvonne L., 959 F.2d at 890 ("If defendants knew of the asserted danger to plaintiffs or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link can be shown, then under the analysis set forth hereafter defendants violated plaintiffs' constitutional rights.").

Second, the legal framework for this doctrine does not support limiting the scope of the special relationship doctrine to only those individuals involved in a child's initial placement. In similar custodial relationships, such as involuntary commitment, a state actor's liability for violation of a patient's constitutional

15

right does not turn on whether she participated in the actual confinement or placement of the individual in the institution.  See, e.g., Youngberg v. Romeo, 457 U.S. 307, 314-16, 324 (1982) (finding involuntarily committed patients entitled to reasonable care and safety pursuant to their Fourteenth Amendment substantive due process rights); Garrett v. Rader, 831 F.2d 202, 205 (10th Cir. 1987).  When searching for the legal foundation for this exception, we find the absence of such a requirement telling.  Moreover, in light of this court's previous statement that "foster children, like involuntarily committed patients, are 'entitled to more considerate treatment and conditions' than criminals," it seems incongruous that the protection extended to foster children would be so limited, as Booker and Peagler argue.  Yvonne L., 959 F.2d at 890.

Finally, if implemented, limiting exposure to liability to only those involved in a child's initial placement would lead to untenable results.  Were we to accept Booker and Peagler's contention that only "the very individual, who has made a placement (a deprivation of liberty), [] becomes responsible under the Due Process Clause to protect the person who was deprived of liberty," aberrant consequences would abound.[10]  Aplts. Reply Br. at 9.  Who would be constitutionally liable for protecting the foster child if the placing individual dies?  Would the placing individual be constitutionally liable for overseeing the

---

[10]  This is especially so when one considers the potential frequency foster children transition between homes, presumably not always within the same county, and the significant period of time spent in foster care.

16

foster child even after she left DHS employment?  Thankfully, we need not entertain such questions because, for reasons previously discussed, we do not view the special relationship doctrine so narrowly.

Further, under the unique facts presented in this case, even if we were to adopt Booker and Peagler's more rigorous interpretation of the special relationship doctrine, they will still fall within its coverage:  Plaintiffs alleged in their amended complaint that DCDHS placed Chandler back in Jon Phillips's home on January 20 and that Booker and Peagler were responsible for overseeing Chandler's case at the time of this second, subsequent placement.  R. at 7, 16-17.  Consequently, Booker and Peagler's argument that the special relationship doctrine does not presently apply because they did not personally participate in Chandler's placement is not compelling.[11]

Booker and Peagler urge that a placement-participation requirement is necessary to prevent imposition of "reverse respondeat superior" liability on all

---

[11]  Booker and Peagler also argue that the state-created danger theory's requirement that the defendant's conduct put the plaintiff at substantial risk implies that the defendant-official must have participated in the child's placement under the special relationship doctrine.  We are not persuaded by this comparison because these doctrines are distinct:  The operation of the special relationship doctrine depends on the existence of a custodial, involuntary relationship between an individual and the State; the state-created danger theory, however, does not require such a relationship.  Gray, 672 F.3d at 923 & n.10 ("[A]pplication of the state-created danger theory is unnecessary and unwarranted where a custodial or special relationship exists between the victim and the State because in that case, the relationship itself gives rise to the State's corresponding duty to protect the victim.").

state DHS employees.  Again, they miss the point.  The special relationship between the State and the foster child is a necessary predicate to imposition of liability under this doctrine, but is not sufficient to establish liability.  Before any state official may be held liable, her conduct must satisfy the elements outlined in Yvonne L.:  She must have known of the asserted danger or failed to exercise professional judgment and such conduct must have a causal connection to the ultimate injury incurred; moreover, her conduct must shock the conscience.  See DeShaney, 489 U.S. at 211 (Brennan, J., dissenting) ("[T]he Due Process Clause is not violated by merely negligent conduct, . . . a social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983.").  Despite Booker and Peagler's assertion otherwise, no DHS employee could be liable under a "reverse respondeat superior" theory for the actions of the department.

We find Booker and Peagler's second argument against the applicability of the special relationship doctrine equally unconvincing as their first.  Booker and Peagler contend the district court erroneously created an aggregate theory of special relationships that extends liability well beyond its original boundary.  Specifically, they disagree with the district court's conclusion that the special relationship followed the jurisdiction of the county departments, and therefore, the county department's employees.  Booker and Peagler contend the district court reached this conclusion by erroneously relying upon Eleventh Amendment

18

case law to conclude that county departments are arms of the State. Citing Graham v. Independent School District No. I-89, 22 F.3d 991 (10th Cir. 1994), and Sutton v. Utah State School for the Deaf & Blind, 173 F.3d 1226 (10th Cir. 1999), Booker and Peagler assert that DCDHS neither had a custodial relationship with Chandler nor restricted Chandler's freedom sufficient to deprive him of liberty.

Both cited cases, however, do not stand for the proposition asserted: Graham simply restated the principle that compulsory school attendance laws do not create an affirmative duty to protect because no custodial relationship exists, and Sutton involved only the state-created danger exception. Graham, 22 F.3d at 994-95 ("We hold foreseeability cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship."); Sutton, 173 F.3d at 1237-38 ("Abandoning any theory that compulsory school attendance laws give rise to a 'special relationship,' a question we do not reach, plaintiff-appellant relies entirely on the 'danger creation' theory."). Moreover, these cases are readily distinguishable due to Chandler's custodial relationship with the State as a foster child, and Booker and Peagler provide no basis for concluding otherwise.

Booker and Peagler's argument that they cannot be held liable under the special relationship doctrine because DCDHS did not have custody of Chandler is not persuasive. Here, Chandler was removed from his biological mother's custody and placed in the legal and physical custody of JCDHS which in turn

19

placed Chandler in a foster home.[12]  Cf. Wooten v. Campbell, 49 F.3d 696, 699-700 (11th Cir. 1995) (finding no special relationship when state had legal custody over the child for the purpose of arranging visitation for noncustodial father, but mother retained physical custody).  As a foster child, Chandler relied upon the State and its county departments,[13] via its placement of him in a foster home, for his basic human needs.  During the period relevant here, Chandler lived with his foster parents in and attended school in Denver County.  By January 20, at the latest, DCDHS accepted responsibility for Chandler by investigating responses to alleged abuse, after his removal from Jon Phillips's home, and subsequently placing Chandler back in Jon Phillips's home in Denver County.  DCDHS took this action after communicating with JCDHS, which declined this referral on the basis that the foster family resided in Denver County.  Accordingly, DCDHS

_____

[12]  It is unclear from the amended complaint the exact chain of events regarding Chandler's custody.

[13]  Pursuant to Colorado statutory law, "[t]he county departments or other state designated agencies . . . serve as agents of the state department and shall be charged with the administration of public assistance and welfare and related activities in the respective counties in accordance with the rules and regulations of the state department."  Colo. Rev. Stat. § 26-1-118(1), -115(1).  Accordingly, the county departments serve as agents of the State of Colorado.  See Colo. Rev. Stat. § 26-1-111(f); Cobbin ex rel. Cobbin v. City & Cnty. of Denver, 735 P.2d 214, 216-17 (Colo. App. 1987) ("The social services programs are matters of exclusive statewide concern."); Wigger v. McKee, 809 P.2d 999, 1004 (Colo. App. 1990) (finding county social services departments "functional divisions of the State Department of Social Services for the convenient administration of the state program and are not independent entities separate and distinct from the state.'" (quoting Nadeau v. Merit Sys. Council, 545 P.2d 1061, 1063 (Colo. App. 1975)).

effectively exercised custody over Chandler. See Henry A. v. Willden, 678 F.3d 991, 1003 (9th Cir. 2012) (finding custodial relationship sufficiently pled despite defendant-officials' argument that they did not have a special relationship because foster children were technically in the custody of a specific county, not the State); Waubanascum v. Shawano Cnty., 416 F.3d 658, 665-66 (7th Cir. 2005) (concluding county overseeing foster child's case and county where foster child lived "had custody" despite neighboring county's legal custody over foster child). As of that date, Booker and Peagler were aware of Chandler's circumstances and were the custodial officials responsible for overseeing Chandler's foster care case. To conclude otherwise, as Booker and Peagler urge, would artificially constrain the doctrine beyond reason.

This doctrine protects individuals who involuntarily enter state custody and subsequently become reliant on the State, through its agencies and officials, to provide their basic human needs, paramount among those safety. DeShaney, 489 U.S. at 200; Youngberg, 457 U.S. at 315 ("[T]his Court has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause."). This involuntary, custodial relationship with the State imposes a continuing constitutional duty on state custodial officials to safeguard individuals in the State's care. Consequently, we are persuaded that plaintiffs sufficiently pled a custodial relationship between the State and Chandler to potentially hold Booker and Peagler individually liable under the special

relationship doctrine.

*Supervisory Liability*

Booker and Peagler also argue the amended complaint does not sufficiently plead a claim for supervisory liability under § 1983 because it does not allege constitutionally depriving action by a DCDHS employee who was supervised by either Booker or Peagler. However, Booker and Peagler failed to raise this issue before the district court, rendering review on appeal inappropriate. See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1127-28 (10th Cir. 2011) (finding with few exceptions that "if [a] theory [raised for the first time on appeal] simply wasn't raised before the district court, we usually hold it forfeited"). "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." Singleton v. Wulff, 428 U.S. 106, 120 (1976).

*Professional Judgment*

Booker and Peagler argue the district court erred in finding that plaintiffs sufficiently pled that they failed to exercise their professional judgment. State officials will only be held liable for violating a foster child's Fourteenth Amendment substantive due process rights if the official "knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown." Yvonne L., 959 F.2d at 890. Whether the state official failed to exercise professional judgment requires more than mere negligence; the official must have

22

abdicated her professional duty sufficient to shock the conscience.  J.W., 647 F.3d at 1011.  Conduct is shocking to the conscience when the "'degree of outrageousness and [] magnitude of potential or actual harm [] is truly conscience shocking.'"  Armijo, 159 F.3d at 1262 (quoting Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996)).  Conscience-shocking behavior evades precise definition and "evolve[s] over time."  Id.  We must consider three guiding principles when evaluating a substantive due process claim:  "(1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."  Uhlrig, 64 F.3d at 573 (citations omitted).

We agree with the district court that the alleged facts more closely parallel those of Johnson ex rel. Cano v. Holmes, 455 F.3d 1133 (10th Cir. 2006), rather than J.W. v. Utah, 647 F.3d 1006 (10th Cir. 2011), as Booker and Peagler suggest.  In J.W., the court concluded that the plaintiffs failed to sufficiently refute the evidence that the caseworker had considered the children's history and safety when making the placement decision—the conduct alleged to be an abdication of duty.  647 F.3d at 1011 (finding that the plaintiffs failed to "argue or cite to 'particularized evidence' showing that this decision 'was an impermissible deviation from professional judgment.'" (quoting Johnson, 455 F.3d at 1144)).  Here, unlike in J.W., plaintiffs proffer particularized evidence that Booker and Peagler impermissibly deviated from professional judgment by

23

dismissing Chandler's case and failing to properly investigate referrals despite evidence of Chandler's continued abuse in disregard of Colorado Department of Human Services' procedure requiring a within 24-hours response. Specifically, plaintiffs contend that Booker and Peagler ignored Chandler's statements to school officials, the emergency caseworker's opinion, Chandler's previous suspicious injuries, Chandler's five-week absence from school, and Mr. Phillips's statement to school officials that Chandler's five-week absence was attributable to "family problems." Moreover, plaintiffs have sufficiently pled a causal connection between the alleged abdication of duty and Chandler's injuries: Had Booker and Peagler timely investigated the April referral they would have discovered Chandler's declining health caused by his continued starvation and dehydration.

These facts more closely resemble those in <u>Johnson</u>, where the court determined questions of fact precluded summary judgment regarding whether a caseworker abdicated her duty by failing to investigate, over a two-month span, the child's removal from day care, a new family member's move into the home with the child, and the firing of the child's home health nurse. 455 F.3d at 1145 ("According to the personal representative's expert witness, [] this was an abandonment of professional judgment.").[14] Viewing Booker's and Peagler's

---

[14] Here, plaintiffs do not proffer an expert's opinion that Booker's and Peagler's conduct abdicated their duty because qualified immunity was raised in a motion to dismiss—rather than a motion for summary judgment as in

24

conduct "in total," the allegations in plaintiffs' amended complaint are at least as conscience-shocking as the facts in Johnson: In addition to Chandler's continued absence from school and removal from "the outside world," here, there were previous suspicions of abuse and Jon Phillips's cryptic reasons for Chandler's absence. See id. at 1144; see also Armijo, 159 F.3d at 1264 (finding that returning a suicidal special-education student to his home, where he had access to firearms, "could be construed as conscience-shocking" behavior sufficient to render summary judgment inappropriate).

As pled, Booker and Peagler ignored known or likely injuries and abuse to Chandler, chose not to further investigate such possible abuse, and ignored the danger posed by his continued residence in Jon Phillips's home. See Currier v. Doran, 242 F.3d 905, 920 (10th Cir. 2001) (finding caseworker's failure to investigate bruises and continued allegations of abuse, as well as responsibility for court order granting custody to caretaker, could be conscience-shocking behavior sufficient to survive dismissal). Of course, discovery may inform the context of Booker's and Peagler's actions such that their behavior was not conscience shocking. See Weise, 507 F.3d at 1265 (recognizing that "the denial of qualified immunity at the dismissal stage does not preclude a renewal of that defense at summary judgment after further factual development has occurred"). However, construing all inferences in plaintiffs' favor, as we must, the facts

Johnson—and the parties have not had the benefit of expert submissions.

25

alleged could be a conscience-shocking abdication of duty sufficient to allege a constitutional violation. Accordingly, whether Booker and Peagler are entitled to qualified immunity depends upon whether the constitutional right was clearly established.

*Clearly Established*

Even if governmental officials participated in "constitutionally impermissible conduct," immunity will shield them from suit so long as their conduct did not violate clearly established constitutional rights. Hope v. Pelzer, 536 U.S. 730, 739 (2002). Whether such a right was clearly established "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson, 555 U.S. at 244 (quoting Wilson v. Layne, 526 U.S. 603, 614 (1999)).

Booker and Peagler assert entitlement to qualified immunity because no Supreme Court or Tenth Circuit case has ever "held that a government employee[,] who was not involved in limiting an individual's liberty, has a constitutional duty to protect that individual," and, therefore, "Ms. Booker [and] Ms. Peagler did not have 'fair warning' that their alleged conduct could result in liability." Aplts. Reply Br. at 15. Booker and Peagler's argument broadly is one of "the level of generality at which the constitutional right must be 'clearly established.'" Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007). They do not dispute that case law has clearly established that foster

26

children have a Fourteenth Amendment constitutional right to be reasonably safe while in the State's custody.  See, e.g., J.W., 647 F.3d at 1011 (citing Yvonne L., 959 F.2d at 892-93) ("Indeed, the constitutional right of foster children to be kept reasonably safe from harm has been clearly established since at least 1985."). Rather, they contend that because no case law explicitly delineates their interpretation of the special-relationship exception—an argument contrary to their previous assertion that the case law explicitly requires such participation—the law was not clearly established.  Booker and Peagler's argument is untenable.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Walker v. City of Orem, 451 F.3d 1139, 1151 (10th Cir. 2006) (quoting Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).  This generality does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Rather, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id.  Since 1985, case law in this circuit and the established weight of authority has clearly established that state officials could violate foster children's substantive due process rights if they knew of an asserted danger to a foster child or failed to exercise professional

27

judgment with respect thereto. Booker and Peagler's singular argument regarding the construction of the special relationship doctrine does not negate that the contours of foster children's constitutional rights were clearly delineated in this circuit as well as other circuits.

Accordingly, reasonable DHS officials overseeing the cases of foster children were on notice that such conduct would violate a foster child's constitutional right. See Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994). Consequently, it was apparent, in light of pre-existing law, to a reasonable official in Booker's and Peagler's positions that failing to investigate the child abuse referrals and dismissing Chandler's case without investigation was an abdication of duty that would violate Chandler's substantive due process right to be reasonably safe from harm as a foster child. See Moore, 438 F.3d at 1042-43. Therefore, on the record presently presented, Booker and Peagler are not entitled to qualified immunity.

IV

The district court correctly determined that plaintiffs sufficiently pled facts, when taken as true, that show Booker and Peagler plausibly violated Chandler's substantive due process right to be reasonably safe while in foster care, which right was clearly established at the time. Accordingly, the judgment of the district court is AFFIRMED.