FILED
United States Court of Appeals
Tenth Circuit

July 12, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TIMOTHY MARVIN BISHOP,

     Plaintiff - Appellee,

v.

ROBYN SINGLETON SZUBA,

     Defendant - Appellant.

No. 17-6136
(D.C. No. 5:13-CV-00171-D)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **McKAY**, and **MORITZ**, Circuit Judges.
_____

Robyn Szuba appeals the district court's order denying her motion for summary judgment on qualified-immunity grounds. Because we agree with Szuba that the district court erred in finding the contours of the right at issue were clearly established, we reverse and remand with directions to enter summary judgment in her favor.

## Background

The Oklahoma Department of Human Services (OKDHS) placed Timothy Bishop in Mark Lewis' foster home in August 1999. Five months later, OKDHS received a

---

[*] This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

report about potential wrongdoing in the Lewis foster home. This report contained allegations of sexual abuse, prompting OKDHS to remove Bishop from the Lewis foster home. Police ultimately learned that Lewis sexually molested Bishop between August 1999 and January 2000. And a jury subsequently convicted Lewis of several crimes, including first-degree rape.

We now turn to events that occurred well before Bishop's placement in the Lewis foster home but that nevertheless form the basis of Bishop's underlying claim against Szuba. As a child-welfare social worker with OKDHS, Szuba investigated reports of suspected child abuse and neglect. As relevant here, she conducted two investigations into Lewis' foster home. The first investigation began in December 1997, after OKDHS received a report alleging that a seven-year old in the Lewis foster home consistently spent late nights at a pool hall, only ate once a day, and had an unexplained red mark on his eye. Szuba interviewed Lewis, the foster child, and others. She found the allegations unsubstantiated.

The second investigation began in March 1999, after OKDHS received another report about the Lewis foster home. This report accused Lewis of exposing the children "to adult sexuality in photos," verbally abusing the children when they lost pool games, forcing the children to work at pool halls for money, failing to feed the children at pool tournaments, and keeping the children out late at night. App. 202. After receiving the report, Szuba interviewed three of the children living in the Lewis foster home. She also interviewed Lewis; the nurse at the children's school; the two child-welfare workers assigned to the children; and Paula Dykes—the mother of one of the children's friends.

2

Dykes told Szuba that she heard "a rumor" from her daughter that Lewis' former secretary resigned because the secretary saw pictures of the foster children in sexual positions. App. 211. But Dykes didn't know the name of the former secretary or where she currently worked. And other than Dykes, none of the other interviewees suspected inappropriate sexual behavior in the Lewis foster home. Indeed, each of the children told Szuba that "they . . . never felt uncomfortable or unsafe in the Lewis foster home." App. 203. Szuba then concluded her investigation and, without following up on the "rumor," ruled out the report's allegations. App. 211.

Based on this chain of events, Bishop ultimately brought a 42 U.S.C. § 1983 claim against Szuba. In support, he alleged that Szuba violated his Fourteenth Amendment rights by failing to adequately investigate the earlier allegations against Lewis. But for Szuba's inadequate investigation, Bishop asserted, OKDHS wouldn't have placed him in the Lewis foster home and Lewis wouldn't have sexually assaulted him.

Szuba moved for summary judgment, arguing, in relevant part, that she was entitled to qualified immunity. The district court disagreed and denied Szuba's motion for summary judgment. She appeals.

**Analysis**

Szuba argues that the district court erred in ruling that she wasn't entitled to qualified immunity on Bishop's § 1983 claim. "We review the district court's qualified[-]immunity determinations de novo, viewing the evidence in the light most favorable to the plaintiff as the nonmoving party." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877 (10th Cir. 2014).

3

When a defendant asserts qualified immunity at summary judgment, "the plaintiff must demonstrate on the facts alleged both that the defendant violated his [or her] constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "If the plaintiff fails to satisfy either part of" this "two-part inquiry, the court must grant the defendant qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

## A.     The Constitutional Violation

As a general rule, state actors can't be held liable under the Due Process Clause for the actions of private citizens. *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995). But there are two exceptions to this general rule: "(1) the special relationship doctrine; and (2) the 'danger creation' theory." *Id.* The parties agree that only the former exception is at issue here.

The special-relationship doctrine "protects individuals who involuntarily enter state custody and subsequently become reliant on the [s]tate, through its agencies and officials, to provide their basic human needs, paramount among those safety." *Schwartz v. Booker*, 702 F.3d 573, 585 (10th Cir. 2012). This relationship "imposes a continuing constitutional duty on state custodial officials to safeguard individuals"— including foster children—who are "in the [s]tate's care." *Id.* at 580, 585. A state official violates this duty if he or she "knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown." *Gutteridge v.*

4

*Oklahoma*, 878 F.3d 1233, 1238–39 (10th Cir. 2018) (alterations and omission in original) (quoting *Schwartz*, 702 F.3d at 580).

But it's not enough for a plaintiff to allege that a state official failed to exercise her professional judgment. *Id.* at 1239. Rather, a plaintiff must show that a defendant "abdicated her professional duty *sufficient to shock the conscience*." *Id.* (quoting *Schwartz*, 702 F.3d at 585–86). "Conduct is shocking to the conscience when the 'degree of outrageousness and [ ] magnitude of potential or actual harm [ ] is truly conscience shocking.'" *Schwartz*, 702 F.3d at 586 (alterations in original) (quoting *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262 (10th Cir. 1998)).

Here, the district court found that Szuba's conduct satisfied the first prong of the qualified-immunity test. App. 503. We have some doubts about that conclusion. Specifically, we question whether there exists an affirmative link between Bishop's injuries and Szuba's conduct. For instance, Bishop didn't reside in the Lewis foster home when Szuba conducted her investigations, and there's no evidence that Szuba had anything to do with Bishop's placement in the Lewis foster home. In fact, Szuba no longer worked for OKDHS at the time of Bishop's placement.

Nevertheless, we assume without deciding that Szuba indeed violated Bishop's constitutional right "to be kept reasonably safe from harm." App. 505 (quoting *Schwartz*, 702 F.3d at 587). We pursue this route because we conclude, for the reasons discussed below, that Bishop fails to satisfy the second prong of the qualified-immunity test. That is, he fails to show the law was clearly established.

5

Accordingly, we need not resolve the constitutional question. *See Perry v. Durborow*, No. 17-5023, 2018 WL 2925202, at *5 (10th Cir. June 12, 2018) (assuming constitutional violation occurred but nevertheless reversing order denying qualified immunity because plaintiff failed to demonstrate that law was clearly established).

### B.    Clearly Established Law

An official is entitled to qualified immunity so long as his or her actions don't "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Schwartz*, 702 F.3d at 587 (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1151 (10th Cir. 2006)). Although "[w]e do not require a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Importantly, the Supreme Court has recently and frequently reminded us that we can't "define clearly established law at a high level of generality." *Id.* (quoting

*al-Kidd*, 563 U.S. at 742); *see also White*, 137 S. Ct. at 552 (requiring court "to identify a case where [official] acting under similar circumstances as [defendant] was held to have violated" relevant constitutional right before treating law as clearly established). Rather, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). As such, we view this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)); *see also White*, 137 S. Ct. at 552 (holding that "the clearly established law must be 'particularized' to the facts of the case" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))); *T.D. v. Patton*, 868 F.3d 1209, 1231 (10th Cir. 2017) (comparing specific facts before court to facts of prior case before determining that prior case clearly established contours of relevant right).

Here, the district court did exactly what the Supreme Court has said not to do: it (1) "define[d] clearly established law at a high level of generality," *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742), and (2) failed to discuss the "'particularized' . . . facts of th[is] case," *White*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U.S. at 640). Specifically, it stated that foster children have a clearly established right to "be kept reasonably safe from harm" while in foster care and that this general right "has been clearly established since at least 1985." App. 505 (quoting *Schwartz*, 702 F.3d at 587). The district court did cite two cases to support this conclusion. But it neither discussed the facts of those cases nor explained whether or how those facts are sufficiently similar to the ones before us to place the constitutional question here

7

"beyond debate." *Mullenix*, 136 S. Ct. at 308. And our independent review of those two cases convinces us that neither one clearly established the contours of the right at issue.

In *Yvonne L. ex rel. Lewis v. New Mexico Department of Human Services*, 959 F.2d 883 (10th Cir. 1992), we held that, as a general matter, foster children indeed have a right "to protection while in foster care." *Id.* at 892–93. And we also set forth the standard for determining whether a defendant has violated that right. *See id.* at 893–94. But we didn't apply that standard to the defendants' conduct. *See id.* Instead, we remanded to the district court to determine, in the first instance, whether a constitutional violation occurred. *See id.* Thus, because we didn't find a constitutional violation in *Yvonne L.*, it doesn't clearly establish the contours of the constitutional right at issue here. *See White*, 137 S. Ct. at 552.

Neither does *Schwartz*, which we decided more than 13 years after Szuba's investigation. *See* 702 F.3d at 573; *Brosseau*, 543 U.S. at 200 n.4 (explaining that when particular legal authority "postdate[s] the conduct in question," that authority is necessarily incapable of giving state officials "fair notice" and is consequently "of no use in the clearly[-]established inquiry"); *Riggins*, 572 F.3d at 1107 (stating that law must be clearly established at time of unlawful activity).

In short, even if we assume that Szuba violated Bishop's Fourteenth Amendment rights, neither *Schwartz* nor *Yvonne L.*—the only two cases the district court cited below—clearly establishes as much. And Bishop doesn't identify on appeal any additional authorities that might. *Cf. Cox v. Glanz*, 800 F.3d 1231, 1247

8

(10th Cir. 2015) (noting that because plaintiff failed to identify specific case or cases "that would indicate [relevant] right was clearly established," court could conclude, "[o]n this basis alone," that plaintiff failed "to defeat [defendant's] assertion of qualified immunity"). Accordingly, Szuba is entitled to qualified immunity. *See id.* (holding that defendant was entitled to qualified immunity because plaintiff "failed to satisfy her burden on the clearly-established-law prong of the qualified-immunity standard"). We therefore reverse the district court's order and remand with directions to enter summary judgment in Szuba's favor.

Entered for the Court

Nancy L. Moritz
Circuit Judge