**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 8, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RACHEL MATTHEWS;
CHRISTY WRIGHT, as next friend
and appointed guardian of JM a/k/a
KM, CM, EM, SP, AP, NP, GM, and
MS,

      Plaintiffs - Appellees,

v.

KILA BERGDORF; RONALD
MOON; VINNIE HARMON;
KAREN QUINN; KAREN FEATHER;
MATTHEW BUDDER; BETH
PANNELL; MARY NOFIRE;
KRISTIN TANNER; JUANITA
GIWA; NIECIE LEWIS; KATHLEEN
KEANEY; LADONNA SIMS; BECKY
DEWEY; CAROL SCHRAAD-DAHN;
ANN MARIE SHRUM; JOAN
HUGHES,

      Defendants - Appellants,

and

STATE OF OKLAHOMA, ex rel.
OKLAHOMA DEPARTMENT OF
HUMAN SERVICES, an agency
of the State of Oklahoma; WILKIE
SANDERS; JERRY MATTHEWS;
DIEDRE MATTHEWS; JOHN DOE;
JANE DOE,

      Defendants.

No. 16-5168

Emily B. Fagan (John K. F. Langford with her on the brief), Assistant General Counsel, Department of Human Services, Oklahoma City, Oklahoma, for Defendants-Appellants.

Connor L. Helms (Gary R. Underwood, Erin M. Moore, and Tiffany K. Peterson with him on the brief), Helms & Underwood, Oklahoma City, Oklahoma, for Plaintiffs-Appellees.

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **LUCERO**, Circuit Judges.

**BALDOCK**, Circuit Judge.

In 2006, the Oklahoma Department of Human Services (ODHS) recognized Jerry and Deidre Matthews as "adoptive parents" of the year for Northeast Oklahoma. But how quickly things changed. After years of reported abuse and neglect, the Delaware County District Court in April 2014 placed all nine children living in the Matthews' two bedroom, two bathroom trailer house in the emergency custody of the State. In June 2016, Jerry Matthews pleaded no contest in Delaware County District Court to reduced charges of child neglect. He received a suspended life sentence in exchange for his promise to testify truthfully against his now former wife, Deidre Matthews. *Oklahoma v. Matthews*, No. CF-2014-117B (Delaware Cty., Okla., July 6, 2016). In October 2017, Deidre Matthews, her fate sealed, pleaded no contest in the same state court to twelve counts of child

2

abuse, child neglect, and child endangerment. *Oklahoma v. Matthews*, No. CF-2014-117A (Delaware Cty., Okla., Oct. 4, 2017). The state court sentenced Deidre Matthews to life in prison with all but four years suspended.

The present case is the civil side of this tragedy. The children, Plaintiffs here, claim among other things that eighteen ODHS caseworkers violated their Fourteenth Amendment substantive due process rights in connection with the horrific events recounted in the complaint.[1] Plaintiffs generally allege that between January 2004 and March 2014, various individuals, all with good cause, reported to ODHS that the children living in the Matthews' home were being mentally and physically abused. At least seventeen reports of abuse and neglect were made to ODHS during this time period. To say the ODHS caseworkers left the children with the Matthews to suffer continued abuse and neglect under deplorable conditions in a dangerous home environment is perhaps an understatement.

The case comes to us from the district court's denial of the caseworkers' motion to dismiss the constitutional claims against them on the basis of qualified immunity. (Seventeen caseworkers have appealed.) *See Matthews v. Oklahoma*, 2016 WL 6078341 (N.D. Okla. 2016) (unpublished). Our review is de novo. *See Dahn v. Amedei*, 867 F.3d 1178, 1185 (10th Cir. 2017). The purely legal questions

---

[1] At the time of the civil suit's filing, only one of the Plaintiffs, Rachel Matthews, had reached the age of majority. The other eight children, J.M. a/k/a K.M., C.M., E.M., S.P., A.P., N.P., G.M., and M.S. are represented by their court-appointed guardian, Christy Wright.

before us are (1) whether the facts alleged in the complaint give rise to constitutional claims against each of the ODHS caseworkers, and if so, (2) whether those claims were clearly established at the time of the alleged constitutional violations. *See Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016). Because the caseworkers have asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to proceed. *See Dahn*, 867 F.3d at 1185. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part. *See Ashcroft v. Iqbal*, 556 U.S. 662, 671–72 (2009) (where a district court's order denying qualified immunity turns on a question of law, such order constitutes a final appealable decision within the meaning of § 1291).

\* \* \*

A state actor generally may not be held liable under the Fourteenth Amendment for harm a private individual intentionally or recklessly inflicts upon a victim. *See DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 (1989). The explanation is simple: Where private violence is responsible for the harm, the state actor has not deprived the victim of any constitutional right; rather the private individual has deprived the victim of life, liberty, or property. *See id.* at 195–97; *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) (McConnell, J.) ("*DeShaney* holds that the state has no affirmative obligation under the Due Process Clause to protect the interests of life, liberty, and property of its citizens against invasion by private actors." (internal quotation marks omitted)).

4

In the Tenth Circuit, only two exceptions exist to this rule: Where a private party inflicts harm upon a victim, a state actor incurs an antecedent constitutional duty to protect the victim if the complainant demonstrates either (1) the existence of a special custodial relationship between the State and victim, or (2) the state actor intentionally or recklessly created the danger that precipitated the deprivation. *Schwartz v. Booker*, 702 F.3d 573, 579–80 (10th Cir. 2012). Plaintiffs' complaint asserts the caseworkers deprived them of liberty under both exceptions to the general rule. In Part I, we address the first exception's applicability to the complaint's factual allegations. In Part II, we address the second exception's applicability to these same allegations.

I.

Before asking whether the complaint alleges facts sufficient to state a cause of action against any of the caseworkers under the special relationship exception, let us recount what those factual allegations must establish to state such a claim. The complaint first must plead the existence of a special relationship between the plaintiff and the State. *Dahn*, 867 F.3d at 1185. We will say more about what this relationship encompasses shortly. For now suffice to say that if the plaintiff fails adequately to allege a special relationship with the State, he or she has no claim against a state actor under the special relationship exception. Second, the complaint must allege facts showing the responsible state actor knew the plaintiff was in danger or failed to exercise professional judgment regarding such danger. *Id.* Third, the

5

plaintiff must plead facts establishing the state actor's conduct caused plaintiff's injuries. *Id.* at 1185–86. Fourth, plaintiff must plead facts tending to shock the conscience. *Id.* at 1186.

A.

In its order denying the caseworkers' motion to dismiss, the district court opined that the caseworkers, rather than making any individualized arguments, "collectively" asserted the defense of qualified immunity. *Matthews*, 2016 WL 6078341, at *8. The caseworkers, according to the court, argued only that the complaint's factual allegations were not "conscience shocking." *Id.* at *9. Therefore, instead of asking whether the complaint stated a claim under the special relationship exception as to *each* caseworker, the district court only asked whether the complaint alleged "any possible claims" that shocked the conscience.

> As to the first prong of the qualified immunity analysis, Plaintiffs have alleged sufficient facts to state a plausible substantive due process violation by at least one [caseworker] against at least one Plaintiff arising under the special relationship doctrine. . . .[T]he court rejects [the caseworkers'] argument that dismissal is proper based on the absence of any alleged conscience-shocking actions in the complaint.

*Id.* The district court's approach constituted error because it shifted the burden to the caseworkers to establish their entitlement to qualified immunity. Perhaps the advocacy of the caseworkers' trial counsel in the district court was less than stellar. But where multiple state actors raise a qualified immunity defense in a motion to dismiss, "good as to one, good as to all" is *never* the proper approach to adjudicating

6

the sufficiency of the complaint.  *See Pahls v. Thomas*, 718 F.3d 1210, 1227–28 (10th Cir. 2013).

"In conducting [a] qualified immunity analysis, . . . courts must consider . . . whether *each* defendant's alleged conduct violated the plaintiff's clearly established rights."  *Id.* at 1227 (emphasis added) (quoting *Hope v. Pelzer*, 536 U.S. 730, 751 n.9 (2002) (Thomas, J., dissenting)).  Before a court may undertake the proper analysis, the complaint must "isolate the allegedly unconstitutional acts of each defendant"; otherwise the complaint does not "provide adequate notice as to the nature of the claims against each" and fails for this reason.  *Robbins*, 519 F.3d at 1250.  Here, the caseworkers' assertion of qualified immunity in their motion, an assertion they made multiple times therein, gave rise to a presumption that they were immune from suit. *See Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016).  This presumption operated such that when the caseworkers raised the defense of qualified immunity, the burden shifted to Plaintiffs to demonstrate the complaints' factual allegations established their right to recover against *each* caseworker.[2]  *See A.M. ex rel. F.M. v. Holmes*, 830

---

[2]  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), requires a plaintiff to allege facts sufficient to show the defendant plausibly violated his or her constitutional rights.  This requires enough specificity to give the defendant notice of the claim asserted.  *See Robbins*, 519 F.3d at 1249.  In *Robbins*, we explained:

> [C]omplaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants.  The *Twombly* standard may have greater bite in such contexts, appropriately
> (continued...)

7

F.3d 1123, 1134–35 (10th Cir. 2016); *see also Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015). If Plaintiffs then failed to establish either prong of the qualified immunity analysis as to any caseworker, that caseworker was entitled to prevail on his or her defense. *See A.M.*, 830 F.3d at 1134–35; *see also Felders v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("The 'record must clearly demonstrate that the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

In sum, the burden was on Plaintiffs to overcome the presumption of immunity that arose as to each individual caseworker once the caseworkers raised the qualified immunity defense. *Pahls* tells us exactly this. There we explained that to state a viable § 1983 claim *and* overcome a qualified immunity defense, plaintiffs "must establish that each defendant . . . [violated] plaintiffs' clearly established constitutional rights . . . . *Plaintiffs must do more than show . . . that 'defendants,' as a collective and undifferentiated whole, were responsible for those violations*.[3]

---

²(...continued)
reflecting the special interest in resolving the affirmative defense of qualified immunity at the earliest possible stage of a litigation.

*Id.* (internal quotation marks omitted).

[3] In *Pahls*, plaintiffs' § 1983 lawsuit claimed viewpoint discrimination in violation of the First Amendment because law enforcement officials forced them to move to an unfavorable location to engage in protest activities but allowed a group espousing the opposite viewpoint to remain in place. *Pahls*, 718 F.3d at 1216. *Pahls*
(continued...)

8

*Pahls*, 718 F.3d at 1228 (emphasis added). What this means for our purposes is that every named Plaintiff had the burden of adequately pleading every element of his or her claim under the special relationship exception—including the existence of a special relationship between himself or herself and the State—against one or more named caseworkers. Whether a plaintiff has adequately pled a special relationship with the State should be the first inquiry in cases like this. "The existence of the special relationship is the pivotal issue." *Dahn*, 867 F.3d at 1186. In its absence, an ODHS caseworker cannot be held liable under the special relationship exception to a Plaintiff suffering injuries at the hands of Jerry and Deidre Matthews—no matter how shocking the complaint's factual allegations.

B.

In *DeShaney*, the Supreme Court set forth the condition necessary to establish the requisite special relationship. The Court explained that when a State takes individuals into custody and holds them against their will, the Constitution imposes upon the State a duty to assume some responsibility for their safety and general well-being: "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration,

---

[3](...continued)
did not present a situation where plaintiffs had to rely on the special relationship exception or state created danger exception to prevail. *Pahls*' factual difference from the present case, however, does not affect the burden shifting analysis we employ once a defendant raises the defense of qualified immunity in a § 1983 action.

9

institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." *DeShaney*, 489 U.S. at 200. A State's affirmative duty to protect an individual under the special relationship exception arises not from the State's knowlege of the individual's predicament or from its expressions of intent to help, but from the limitation which the State has imposed on such individual's freedom to act on his or her own behalf. *Id.* at 200. "[T]he restraint of liberty necessary to invoke substantive due process protection under the special relationship exception requires state action involving force, the threat of force, or a show of authority, with the intent of exercising dominion and control over the person." *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 924 (10th Cir. 2012). *DeShaney* named incarceration and involuntarily commitment as affirmative acts of the State triggering substantive due process protection under the exception. *DeShaney*, 489 U.S. at 198–99. We subsequently recognized a State's affirmative act of placing a child in involuntary foster care as a similar restraint on liberty triggering constitutional protection under the exception. *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000). But this is as far from *DeShaney* as we have ventured.

Paragraph 29 of the complaint alleges that "[s]ome of the children were placed with the Matthews by [O]DHS through the foster care program, some ended up being adopted by the Matthews, some had a legal guardianship with the Matthews and some of the children were just living with them." Paragraph 76 then concludes that

10

"[a]s children of the foster care system, guardianship, and defacto wards of the State," Plaintiffs "had a special relationship with the State of Oklahoma." Given controlling precedent, the factual allegations contained in Paragraph 29 alone put us on notice of a potential problem with Plaintiffs' legal conclusion in Paragraph 76 that each of them had a "special relationship" with the State. In *DeAnzona*, we reasoned that "[a] plaintiff must show involuntary restraint by the government to have a claim under a special relationship theory, if there is no *custodial* relationship there can be no constitutional duty." *DeAnzona*, 222 F.3d at 1234 (emphasis added). In other words, "[t]he state has a special relationship with only individuals dependent completely on the state to satisfy their basic human needs. In the Tenth Circuit, the classic examples are prisoners, individuals committed against their will to mental institutions, and individuals in state run foster care." *Id.* (internal brackets, citations, and quotation marks omitted).

Tenth Circuit precedent dictates that a child in Oklahoma's state-run foster care program is in the custody of the State. Oklahoma law predictably leads us to the same conclusion. *See, e.g.,* 10A Okla. Stat. § 1-7-103(A) (imposing on ODHS the duty to provide for the care and treatment of a child placed in ODHS's custody; further directing that in providing for such care and treatment, ODHS may place the child in foster care); *see also id.* § 1-4-805(A) (providing for notice prior to removal where a child "placed in the custody" of ODHS has resided with a foster parent for at least three months). Accordingly, a child while in Oklahoma foster care has the

11

"special relationship" with the State necessary to give rise to an antecedent duty on the part of the State to protect him or her.

But a child alleged to be adopted, living with an adult pursuant to a guardianship, or "just living" with an adult is not in the custody of the State and, unlike a foster child, does not have a special relationship with the State. An adopted child is in the custody of his or her adoptive parents. Similarly, a child living in Oklahoma pursuant to a court-ordered guardianship is in the custody of his or her guardian. "A guardian, including a special guardian, of the person is charged with the custody of the ward, and must look to the support, health and education of the ward."[4] 30 Okla. Stat. § 1-120(A). Lastly, we need cite no authority for the proposition that a child "just living" with an adult is not in the State's custody. Under none of the latter three scenarios does the Constitution permit us to say that ODHS caseworkers may be held responsible pursuant to the special relationship exception for harm the Matthews inflicted upon their victims. Rather, the special relationship exception has no application in these situations, and so far as the exception is concerned, the Fourteenth Amendment has nothing to say about the

_____

[4] Nothing in the complaint suggests the guardianships to which certain Plaintiffs were subject were limited in any way. *See* 30 Okla. Stat. § 1-108 (classifying guardianships as general, special, or limited). In Oklahoma, only "[l]imited guardians of partially incapacitated persons shall not have custody of the person of the ward"; rather, such guardians have only the powers and controls specified by court order. *Id.* § 1-120(B). This does not necessarily mean, however, that the State exercises custody over the ward in the case of a limited guardianship.

12

caseworkers' liability.

C.

With a proper understanding of the special relationship exception in hand, we turn to the arduous task of sorting through the complaint's sweeping factual allegations. We may promptly dispose of any claims S.P., A.P., N.P., J.M. and C.M. purport to state under the exception. Paragraph 74 of the complaint alleges "Plaintiffs S.P., A.P., N.P., and J.M. lived in the Matthews' home pursuant to a guardianship." We have just learned, however, that the special relationship exception does not encompass a guardianship established under Oklahoma law because the State does not exercise custody over the ward subject to the guardianship. Therefore, S.P., A.P., N.P., and J.M. fail to state a cause of action under the exception.[5] As for C.M., the complaint does not specify how he or she came to reside with the Matthews or under what terms and conditions he or she resided with them. This means the complaint alleges no special or custodial relationship between C.M. and the State as well. So C.M. also fails to state a claim against any of the caseworkers under the special relationship exception.

_____

[5] According to Paragraph 49, J.M. is the daughter of Julie Matthews. Julie is the adopted daughter of Deidre Matthews. Thus, J.M. is the granddaughter of Deidre Matthews. The Matthews obtained guardianship over J.M. a/k/a K.M. on May 8, 2008. Because the complaint does not allege J.M.'s custody status prior to this date, J.M. apparently was "just living" with the Matthews.

13

Next let us consider the special relationship claims of Plaintiffs Rachel Matthews and G.M. Paragraph 34 alleges ODHS placed Rachel and G.M. in the Matthews' home on December 12, 2003. Paragraph 37 alleges the Matthews adopted Rachel and G.M. on July 12, 2004. Consequently, Rachel and G.M. were in a special relationship with the State of Oklahoma only from the time of their placement with the Matthews in December 2003 until their adoption in July 2004. *See Dahn*, 867 F.3d at 1186 n.7. But the only allegation of ODHS involvement during this period is contained in Paragraph 36 of the complaint, which states that sometime in February 2004, "the Matthews entered into a written plan of compliance due to Deidre Matthews' use of corporal punishment on Rachel Matthews and G.M."

Notably, Paragraph 36 fails to identify any specific ODHS caseworker responsible for the plan and is deficient on this basis alone. *See Robbins*, 519 F.3d at 1250. Moreover, Paragraph 36 considered in the context of the entire complaint is insufficient to establish at least two elements necessary to sustain a cause of action under the special relationship exception. The complaint does not suggest knowledge *at this point* in 2004 of any imminent danger to the children, or a lack of professional judgment on the part of the unidentified caseworker(s). Nor does the complaint suggest ODHS's handling of the situation—requiring a written compliance plan in response to corporal punishment—caused any injury to Rachel Matthews or G.M., let alone injury arising out of facts that shock the conscience. At best, Paragraph 36's allegations are in hindsight a general foreboding of things to come. Plaintiffs

14

Rachel Matthews and G.M. state no cause of action against any named caseworker under the special relationship exception.

Plaintiff E.M.'s claim of a special relationship with the State presents a different factual scenario. Paragraph 75 alleges that E.M. is the daughter of Julie Matthews. E.M. was born when Julie Matthews, then known as Julie Ann Shade, "was a ward of the State and a foster child placed with the Matthews." Paragraph 75 concludes that under such circumstances, E.M. "was defacto a responsibility of the State." The question of whether a State by operation of law takes custody of an infant born to a minor in foster care is one we have not encountered and one we need not resolve here. Even *assuming* the State formed a special relationship with E.M. upon his or her birth, this relationship ended with E.M.'s adoption. Paragraph 42 tells us E.M. was born on December 20, 2005 and adopted on January 8, 2007. Paragraphs 43 and 44 then reference E.M. as part of ODHS Referral 1023916 on January 12, 2006. But these paragraphs identify Vickie Brumback as the responding caseworker. Vickie Brumback is not a named Defendant and the only reference to her in the complaint appears in Paragraph 43.

Given the paragraphs' failure to identify any of the named caseworkers as responsible for handling the referral, "it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed" in regard thereto. *Robbins,* 519 F.3d at 1250. A complaint that fails to differentiate wrongful acts among multiple defendants, alleging instead multiple violations by

15

unspecified defendants does not provide the fair notice the law requires. *See* Fed. R. Civ. P. 8 (requiring a "short and plain statement of the claim" showing entitlement to relief against the defendant); *see also Robbins,* 519 F.3d at 1250. Thus, E.M. has no claim against any named caseworker under the special relationship exception.

Finally, we address the alleged status of M.S., a special needs child who at times required the use of a wheelchair. Paragraph 38 of the complaint says ODHS placed M.S. in the Matthews' home on June 10, 2005. Paragraph 45 indicates that on January 11, 2007, the Matthews "were appointed" guardians of M.S. Paragraph 48 tells us "the guardianship was dismissed" when "on July 1, 2008, the Matthews did not appear for Plaintiff M.S.'s guardianship review." But the complaint fails to allege M.S.'s custody status after this date. Therefore, the complaint alleges facts sufficient to establish a special relationship between M.S. and the State only from June 10, 2005 until January 11, 2007. During this time, ODHS received Referral 990680, the first of many over the next several years regarding the increasingly dire situation at the Matthews' residence. Paragraph 39 alleges:

> On June 29, 2005, referral 990680 was made to [O]DHS concerning neglect in the form of inadequate or dangerous shelter and inadequate physical care. The reporter alleged that the home was dirty, the children were bathed once a week to save money on water, the children had no socks in the winter, the laundry was dirty, the yard was dangerous and a preteen boy and girl were sharing a bedroom. The referral was screened out and no one at [O]DHS took any action to protect Rachel Matthews, G.M. or M.S. The referral was handled by Kila Bergdorf and D. Johnston.

16

Because M.S.'s involuntary, custodial relationship with the State as of June 10, 2005 imposed a continuing constitutional duty on ODHS caseworkers to safeguard M.S. during the duration of this relationship, M.S. has adequately alleged the first element of the special relationship exception, *i.e.*, the existence of a special relationship between M.S. and the State.[6] *See Schwartz*, 702 F.3d at 585. M.S. has also sufficiently alleged the second element of the exception. Unlike Paragraphs 43 and 44 previously discussed, Paragraph 39 specifically identifies Defendant Kila Bergdorf as the caseworker who allegedly failed to exercise professional judgment regarding the danger M.S. faced in the Matthews' home. (The other caseworker alleged to have handled the referral, D. Johnston, is not a named Defendant.) M.S. has alleged the third element of the special relationship exception as well. Paragraph 95 addresses causation: "Plaintiffs suffered actual physical injury and mental pain and suffering as a direct result of . . . [ODHS] employees . . . failing to properly investigate referrals of neglect and abuse of Plaintiffs, and failing to protect Plaintiffs from the Matthews' neglect and abuse . . . ."

The question remaining is whether M.S. has alleged facts *related to the referral* that tend to shock the conscience. Paragraph 39 alleges caseworker

---

[6] Paragraph 39 alleges that Rachel Matthews, G.M., and M.S. were all victims of ODHS's nonfeasance in June 2005. But Paragraph 37 tell us the Matthews adopted both Rachel and G.M prior to June 2005. Consequently, neither Rachel nor G.M. was in a special relationship with the State at the time of the subject referral. *See Dahn*, 867 F.3d at 1186 n.7.

17

Bergdorf "screened out" a referral that alleged the Matthews' foster home was dangerous and filthy, M.S. did not bathe frequently, his or her clothes were dirty, and preteen children of different sexes were sleeping in the same room. We believe these allegations, while perhaps not conscience shocking on their face, render it plausible that Bergdorf failed to exercise professional judgment regarding a conscience-shocking situation at the Matthews' residence, a situation that grew progressively worse over time. What the rules of notice pleading call for is a complaint alleging enough facts to raise a reasonable expectation that discovery will reveal evidence that a constitutional violation has in fact occurred. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."). M.S. has met this calling with regard to his or her claim against caseworker Bergdorf under the special relationship exception.[7]

But this is the only cause of action Plaintiffs' complaint states under the special relationship exception. Discovery may proceed on Plaintiff M.S.'s claim against Defendant Bergdorf because in 2005 the law was well established such that

---

[7] To satisfy the "shock the conscience" standard, M.S.'s discovery must establish not only that Bergdorf "intentionally or recklessly caused injury to [M.S.] by abusing or misusing governmental power." Such discovery also "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995).

18

a reasonable caseworker cognizant of the governing law would have understood Bergdorf's failure to protect M.S. in light of child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception. *See Yvonne L. ex rel. Lewis v. N.M. Dept. of Human Servs.*, 959 F.2d 883, 892–93 (10th Cir. 1992) (holding the law was clearly established in 1985 that a caseworker had a constitutional duty to protect a foster child from private harm the caseworker knew or suspected would likely occur); *see also Schwartz*, 702 F.3d at 588. Thus, the district court properly denied caseworker Bergdorf's defense of qualified immunity as to M.S.'s particular claim against her. To the extent the complaint otherwise purports to state any cause of action under the special relationship exception, however, the district court, for the reasons stated, erred in denying the caseworkers qualified immunity.

## II.

Applying the same rules of pleading and law of qualified immunity recited in Part I.A., let us now turn to a discussion of the state-created danger exception and the extent to which Plaintiffs' complaint states a claim under the second exception to the general rule that a state actor may not be held liable for harm a private individual inflicts upon a victim. The state-created danger exception is a means by which a state actor, *absent a special or custodial relationship between the victim and the State*, might be held liable for an act of private violence. *Gray*, 672 F.3d at 922. Like the special relationship exception, the state-created danger exception is narrow.

19

*Id.* at 921.  *DeShaney* decided the State has no affirmative obligation under the Due Process Clause to protect a plaintiff from acts of private violence where a plaintiff is unable to allege a special relationship.  *DeShaney*, 489 U.S. at 197.  Foreseeability alone does not create an affirmative duty to protect on behalf of the State.  *Gray*, 672 F.3d at 916  This means a state actor, *absent some prior affirmative act by the actor giving rise to a duty to protect*, cannot be held liable under the state-created danger exception for the *failure* to protect a plaintiff from harm.  *Robbins*, 519 F.3d at 1251. In particular for our purposes, the state-created danger exception has no application if Plaintiffs' claims are based on the mere failure of ODHS caseworkers to respond to a referral by removing Plaintiffs from the Matthews' home and placing them in a safe environment.  Such claims of inaction, no matter how prolific, are "insufficient as a matter of law to result in liability" under the state-created danger exception.  *Id.*  A state-created danger necessarily involves affirmative conduct on the part of a state actor in placing a plaintiff in danger of private violence.  *Gray*, 672 F.3d at 916.

In addition to adequately pleading affirmative conduct and private violence as part and parcel of any claim arising under the state-created danger exception, a plaintiff must also adequately allege the following: (1) the state actor created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) plaintiff was a member of a limited and specifically definable group, (3) the state actor's conduct put plaintiff at substantial risk of serious, immediate, and proximate

harm, (4) the risk was obvious or known, (5) the state actor acted recklessly in conscious disregard of the risk, and (6) such conduct, when viewed in total, was conscience shocking. *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014) (describing affirmative conduct and private violence as "preconditions" to a state-created danger claim); *see also Gray*, 672 F.3d at 920 & n.8 (same).

A.

In its analysis of the state-created danger exception, the district court again erred by effectively shifting the burden to the caseworkers to establish their entitlement to qualified immunity on an individual basis. *See supra* Part I.A. The court commented: "Again, [O]DHS employees did not make any individualized arguments. Plaintiffs have alleged sufficient facts to state a substantive due process violation by at least one [O]DHS employee against at least one Plaintiff arising under the danger-creation theory." *Matthews*, 2016 WL 6078341, at *9. Here we reiterate the burden was on Plaintiffs to overcome the presumption of immunity that arose as to each individual caseworker once the caseworkers, collectively or otherwise, raised the defense of qualified immunity. *See A.M.*, 830 F.3d at 1134–35; *Quinn*, 780 F.3d at 1004. The district court simply missed the mark when it reasoned that "the complaint sufficiently alleges that each and every named [O]DHS employee played a role in the deprivation. Even those mentioned only once, . . . at least plausibly bear some responsibility for failing to curtail the alleged abuse when presented with a specific referral." *Matthews*, 2016 WL 6078341, at *8. In *Currier v. Doran*, 242

21

F.3d 905, 920–21 (10th Cir. 2001), we rejected the argument that the state-created danger exception requires a caseworker "to rescue the children because she was aware that her fellow co-workers [or anyone else for that matter] had created the danger."

The district court's decision that the caseworkers as a collective and undifferentiated whole were responsible for the harm the Matthews wrought upon Plaintiffs tells no particular caseworker why he or she must answer the complaint. *See Pahls*, 718 F.3d at 1227–28; *Robbins*, 519 F.3d at 1250. The reader should well understand by now that every named Plaintiff had the burden of adequately pleading every element of his or her claim under the state-created danger exception against a particular caseworker. *See Pahls*, 718 F.3d at 1228. Whether a plaintiff in seeking to invoke the exception in cases such as this has adequately alleged affirmative conduct on the part of the State must be the initial focus of the district court. In its absence, an ODHS caseworker had no antecedent duty to protect a Plaintiff from Jerry and Deidre Matthews, at least so far as the state-created danger exception to the Fourteenth Amendment is concerned.

### B.

Paragraph 84 of the complaint states the ODHS caseworkers, "either [1] by a failure to properly investigate and process reports of child abuse and neglect, or [2] by actively interfering with the detection of child abuse and neglect, abdicated their duties as [O]DHS employees while knowing that Plaintiffs were in imminent

22

danger while housed by the Matthews." Consistent with the first clause of Paragraph 84, the complaint tells us ODHS Referrals 990680 (¶ 39), 1094023 (¶ 46), 1100785 (¶ 47), 1173079 (¶ 49), 1265856 (¶ 50), 1272041 (¶ 51), 1324614 (¶ 52), 1441380 (¶ 53), 1441633 (¶ 54), 1505401 (¶ 55), 512926 (¶ 56), 1564341 (¶ 57), 1581812 (¶ 58), 1587069 (¶ 59), and 1587880 (¶ 62), resulted in some ODHS investigations and reports but no action to protect Plaintiffs. Referral 1023916 (¶¶ 43, 44) resulted in a "Written Plan of Compliance" that unspecified Defendants failed to follow. Finally, Referral 1587553 (¶ 60) led the Delaware County Sheriff's Office to take G.M. into protective custody, but "[O]DHS did not take the other children away from the Matthews and did nothing to protect them." To make a long story short, none of the complaint's allegations surrounding these seventeen referrals give rise to a claim under the state-created danger exception because they do not include any allegation of affirmative conduct on the part of any specified ODHS caseworker.

Consistent with the second clause of Paragraph 84, however, Paragraph 63 alleges that ODHS caseworkers would warn the Matthews when an investigator was scheduled to arrive at the home to inspect the property and speak with the children: "At the direction of [Defendant] Karen Feather, [Defendant] Carol Schraad[-Dahn] would call Deidre Matthews approximately twenty-four to forty-eight hours in advance of home inspections. The purpose of these warnings was to allow the Matthews enough time to clean their home and rehearse interviews with the children." Paragraph 63 specifically charges named caseworkers, Defendants Feather

23

and Schraad-Dahn, with affirmative conduct that increased Plaintiffs' vulnerability to the alleged abuse and neglect, i.e., private violence, they faced daily while residing in the Matthews' home. Moreover, the complaint's allegations are sufficient to establish Plaintiffs were members of a limited and specifically definable group, Feather's and Schraad-Dahn's conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm, the risk was obvious or known (otherwise why the warnings?), Feather and Schraad-Dahn acted recklessly in conscious disregard of the risk, and such conduct, when viewed in the entirety of the complaint, was conscience shocking. Accordingly, Plaintiffs state a cause of action against caseworkers Feather and Schraad-Dahn under the state-created danger exception.

This leaves us with the question of whether the law surrounding the state-created danger exception as applied to the alleged facts was clearly established at the time of the two caseworkers' purported malfeasance. To show the law was clearly established, "the plaintiff does not have to show the specific action at issue had been held unlawful;" rather the alleged unlawful "conduct must have been apparent in light of preexisting law." *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998). In 2001, we held a state caseworker could be held liable under the state-created danger exception for instructing a mother to stop making abuse allegations against the children's father. *Currier*, 242 F.3d at 921. We reasoned that by actively discouraging the mother from reporting suspected wrongdoing, the caseworker increased the children's vulnerability to their father's

24

abuse. *Id.* at 922.

We see little distinction between the affirmative act of instructing an individual to cease reporting evidence of abuse as occurred in *Currier* and the affirmative act of warning an individual so that the latter might cover up evidence of abuse as alleged here.[8] Both acts effectively impede access to protective services, and perhaps additional sources of assistance, otherwise available to the victims. *See id.* After we decided *Currier* in 2001, the law was well established in the Tenth Circuit such that a reasonable caseworker cognizant of the law would have understood the following: A caseworker's affirmative actions allegedly designed to shield and protect the Matthews in light of repeated child abuse and neglect referrals could give rise to constitutional liability under the state-created danger exception. Thus, the district court properly denied caseworker Feather's and Schraad-Dahn's defense of qualified immunity on this particular claim. For the reasons stated, however, the district court erred in denying the remaining named caseworkers qualified immunity on Plaintiffs' state-created danger claims.

\* \* \*

---

[8] In *T.D. v. Patton*, 868 F.3d 1209 (10th Cir. 2017), we recently held *Currier* clearly established the unlawfulness of a caseworker's affirmative custody recommendation to the court, where the caseworker did not express to the court her concerns for the child's safety under such an arrangement. *Id.* at 1225. The caseworker's supervisor told her the child would remain in his father's home, and the caseworker feared she would be fired if she did not recommend the child remain with his father. *Id.* at 1216, 1227–28.

ODHS and its caseworkers may find solace in the fact that to a large degree they have prevailed on appeal. If so, they are sorely mistaken for no solace is to be found within these written words. Assuming the allegations of the complaint have some basis in fact (and we suspect they may), any layperson would think a court justified in throwing ODHS and its caseworkers "under the bus." We too cannot help wondering what is going on at ODHS and its Delaware County office that would allow this undeniable tragedy to extend over a period of several years, a tragedy that resulted in unspeakable and perhaps irreparable harm to the children and the criminal convictions of both Jerry and Deidre Matthews.

But in *DeShaney*, the Supreme Court, at least for now, marked the path we are sworn to follow. Notwithstanding the "undeniably tragic" facts presented in that case (the father beat the child so severely that he rendered the child "profoundly" handicapped and in need of institutionalization), the Court explained the Due Process Clause of the Fourteenth Amendment "does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 191, 193, 202. Today we have pronounced no new law; we have done nothing more than apply binding precedent. To allow Plaintiff's complaint to proceed on claims that have no basis in constitutional jurisprudence would thwart the aims of qualified immunity and impose excessive discovery costs on Defendants absent legal justification. *See Robbins*, 519 F.3d at 1248. The people of the State of Oklahoma "may well prefer a system of liability which would place upon the State and its officials the

26

responsibility for failure to act in situations such as the present one." *DeShaney*, 489 U.S. at 203. The people may create such a system if they have not already done so. But "when the allegations in a complaint, *however true*, could not raise a claim of entitlement to relief [under the Constitution], this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (emphasis added) (internal ellipses and quotation marks omitted).

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED to the district court for further proceedings consistent with this opinion.