**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 14, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SHERMAINE WALKER, individually and
as administrator of the estate of Marques
Davis, deceased; KATHLEEN FORSYTH,
as Guardian Ad Litem of I.D.F.,

    Plaintiffs - Appellees,

v.

SOHAIB MOHIUDDIN, M.D.,

    Defendant - Appellant,

and

CORIZON HEALTH, INC., formerly
known as Correctional Medical Services;
PAUL CORBIER, M.D.; KARL SAFFO,
M.D.; HEATHER UNGEHEUR, APRN;
NANCY CISKEY, APRN; RHONDA
DURANT, APRN; DEBRA LUNDRY, RN;
JENNIFER HELUS, RN; SARAH
MENDOZA; BARBARA DICKERSON,
RN; KAREN DENNIS, RN; KELLY
FRENCH, RN; JENNIFER VEST, RN;
JOHN OR JANE DOE 1, Medical Director;
JOHN OR JANE DOE 2, Health Services
Administrator; JOHN OR JANE DOE 3,
Director of Nursing,

    Defendants.

No. 19-3070

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:17-CV-02601-DDC-KGG)**

Eric Turner, Foulston Siefkin LLP, Overland Park, Kansas (Thomas L. Theis, Foulston Siefkin LLP, Topeka, Kansas, with him on the briefs), for Defendant - Appellant.

Kyle McRae (Leland F. Dempsey on the brief), Dempsey & Kingsland, P.C., Kansas City, Missouri, for Plaintiffs - Appellees.

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **CARSON**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Marques Davis was an inmate at the Hutchinson Correctional Facility ("HCF") from June 2016 until his death in April 2017. During the course of his confinement, Davis suffered from constant neurological symptoms, the cause of which went untreated by HCF medical personnel. When he eventually died from Granulomatous Meningoencephalitis, Davis's brain was so swollen the upper part was forced downward into the lower part (i.e., tonsillar herniation). Davis's estate ("the Estate") brought federal and state law claims against Corizon Health, Inc. ("Corizon") and numerous health care professionals who interacted with

-2-

Davis during his incarceration. One such medical professional, Dr. Sohaib Mohiuddin, filed a qualified-immunity-based motion to dismiss the Estate's 42 U.S.C. § 1983 claim. The district court denied the motion, concluding the complaint set out a clearly established violation of Davis's right to be free from deliberate indifference to the need for serious medical care. Mohiuddin appeals, asserting the district court erred in determining the complaint's conclusory and collective allegations state a valid Eighth Amendment claim as to him. Upon de novo review, this court concludes the complaint does not state a valid deliberate indifference claim as to Mohiuddin. Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291,[1] we **reverse** the denial of Mohiuddin's motion to dismiss and **remand** the matter to the district court for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. Factual Background

In 2010, Davis was sentenced to serve time in the Kansas penal system. He was transferred to HCF in June 2016. Prior to his arrival at HCF, Davis was a healthy twenty-seven-year-old man. During Davis's incarceration at HCF, the

---

[1]*See Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) ("[A] district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a final decision within the meaning of § 1291." (quotation omitted)).

Kansas Department of Corrections contracted with Corizon to provide medical care for inmates. Mohiuddin was a Corizon employee assigned to HCF.

In July and August 2016, Davis began experiencing numbness in his feet, weakness in his right leg, and severe mid-back pain. He reported his symptoms to numerous unnamed Corizon healthcare providers.[2] A Corizon doctor determined Davis's symptoms were caused by his blood pressure medication and discontinued the medication.

During September 2016, Davis made approximately twelve visits to HCF's medical unit concerning numbness in his feet, weakness of his right leg, severe mid-back pain, and an increasing difficulty in walking. Healthcare providers prescribed Tylenol and ordered a lumbar x-ray, but noted Davis appeared to be malingering.

In October 2016, Davis made eight visits to the medical unit for the same symptoms. Doctor Karl Saffo noted Davis's muscle weakness and numbness in his feet. Saffo's notes indicate he was going to seek approval for "EMG studies" of Davis's lower extremities. During that same period, a nurse documented the

_____

[2]Mohiuddin is one of sixteen healthcare providers named as defendants in the Estate's complaint. As set out more fully below, the complaint does not set out any meaningful details as to Mohiuddin's particular role in Davis's care. Instead, the allegations in the complaint refer generally and collectively to the actions of "healthcare providers" in being deliberately indifferent to Davis's serious medical needs.

need for an MRI referral.  Neither an MRI nor "EMG studies" took place during October.

In November 2016, Davis visited HCF's medical unit five times for the same symptoms.  During this month, Davis received "EMG studies" of his lower extremities and a neurology consultation.  Davis's EMG results were documented as normal.

In December 2016, Davis visited HCF's medical unit eight times as his symptoms continued to worsen.  In addition to his previous symptoms, Davis complained of pain, numbness, and itching in his arms that radiated from his elbows to his fingertips.  He also told healthcare providers that "it feels like something is eating my brain."  Davis requested an MRI.

In January 2017, Davis made four visits to HCF's medical unit.  Corizon healthcare providers continued to give him Tylenol in response to his complaints.  After Davis passed out on January 19, he was placed in HCF's infirmary.  Corizon healthcare providers placed Davis on prednisone for ten days without documenting any diagnosis.  Davis remained in the infirmary until February 14th.  During this time, healthcare providers prescribed Tylenol and constipation medicine.  Healthcare providers also continued to document their beliefs Davis was faking illness.  On February 5th, Corizon medical personnel documented that they would seek a neurology consultation.  Davis never received such a consult.

On February 21st, Davis returned to the medical unit for a follow-up visit. Corizon healthcare providers documented that an EKG done during the visit was abnormal and that a neurology consult request was not approved. Two days later, a corrections officer brought Davis to the medical unit. Medical personnel documented that Davis was "dizzy and unsteady on his feet" and had trouble tracking with his eyes, sluggish pupillary reaction, and erratic eye movement. On February 27th, Davis was placed in the infirmary for dizziness, but was discharged the next day.

In March 2017, Davis's condition continued to decline. He made seven additional visits to the medical unit. He continued to suffer from numbness in his feet, weakness of his right leg, severe mid-back pain, an increasing inability to walk, numbness in his hands, dizziness, vision problems, and migraines. During this time period, however, numerous healthcare providers continued to document Davis was faking his symptoms. On March 25, nurse Nina Morales saw Davis for an emergency visit. She documented that Davis "also reports dizziness, balance disturbances, and decreased vision to right eye. Fingers to hands are stiff and bend in abnormal directions. Arms shake uncontrollably." Davis was, nevertheless, released from the infirmary. Later that night, Davis was again admitted to the infirmary after he was found lying on the floor outside his cell. Health Care providers gave Davis Tylenol and documented his dizziness and that

his "whole body is shaking." On March 26th, Davis's condition worsened further. In addition to all his previous symptoms, he began acting erratically and uncharacteristically. He needed assistance using the toilet and began urinating in cups and his water pitcher. Because of his bizarre behavior, he was moved to an isolation cell within the infirmary. Through either mistake or fabrication, "Corizon healthcare providers documented [Davis's] brain MRI came back as 'normal' and that a neurology consult had been ordered." In fact, at this point in time, Davis had never received an MRI of his brain.

During the remainder of March and the beginning of April 2016, Davis's condition continued to worsen. He frequently urinated and defecated on himself and made no attempt to clean up. He became increasingly confused, as he began slurring his speech, talking incoherently, and drinking his own urine. By this time, he also noticeably lost weight and was eating only small portions of his meals. "Corizon healthcare providers continued to dismiss [Davis's] complaints as fake, but ordered a neurology consult 'ASAP.'" A Neurology consult was eventually scheduled for June 22, 2017, but Davis died before it could take place.

Davis finally received an MRI of his brain on April 11, 2017. The MRI indicated a wide-spread infection throughout Davis's brain and evidence of tonsillar herniation. Davis was not immediately hospitalized after the results of his MRI. Instead, Corizon healthcare providers moved him back to his isolation

cell within the infirmary. The only paragraph of the complaint that specifically mentions Mohiuddin, paragraph 145, states as follows:

> After Decedent [Davis's] abnormal April 11, 2017 MRI, Defendants Paul Corbier, M.D., [Mohiuddin], and Karl Saffo, M.D., were deliberately indifferent to his rights under the Eighth Amendment of the U.S. Constitution in that said defendants failed and refused to order immediate hospitalization in light of a life threatening, serious medical need.

On April 12th, at 12:25 p.m., Davis went into cardio-pulmonary arrest. Corizon healthcare providers began administering CPR at 12:42 and notified emergency medical services. Davis was taken to a local hospital, where he died the next day. A brain CT at the hospital before Davis's death showed dramatic tonsillar herniation. According to the complaint, given the dramatic swelling of the brain, "[t]here was no hope of recovery for Davis." An autopsy eventually revealed advanced Granulomatous Meningoencephalitis involving the lungs, liver, kidney, and brain.

## B. Procedural Background

The Estate filed suit against, inter alia, Mohiuddin. Count IV of the Estate's complaint, which invoked 42 U.S.C. § 1983, asserted Mohiuddin and others were deliberately indifferent to Davis's serious medical needs and failed to provide essential medical care and treatment. Mohiuddin moved to dismiss Count IV of the complaint on the basis of qualified immunity. In particular, citing this court's decision in *Robbins v. Oklahoma*, 519 F.3d 1242, 1246-50 (10th

-8-

Cir. 2008), Mohiuddin asserted that, after discounting the collective allegations against Corizon's "healthcare providers," the limited allegations in the complaint failed to allege a constitutional violation on his part. The district court disagreed, concluding the allegations in the complaint "suffice to support a plausible inference that Dr. Mohiuddin—as a licensed physician assigned to provide medical care to HCF inmates—either observed Mr. Davis's symptoms and behavior or was made aware of those symptom and his condition, but still failed to ensure proper medical treatment."

### III. ANALYSIS

On appeal, Mohiuddin asserts the district court erred in concluding the Estate's complaint states a viable Eighth Amendment deliberate indifference claim against him. Given the conclusory and nonspecific allegations set out in the complaint, this court agrees with Mohiuddin's assertion.

This court reviews de novo the district court's denial of a qualified-immunity-based motion to dismiss. *Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019).[3] "To survive a motion to dismiss, a complaint must contain

---

[3]When a government official's conduct does not violate clearly established constitutional rights of which every reasonable official would have known, qualified immunity generally shields that official from liability. *Perry v. Durborow*, 892 F.3d 1116, 1120 (10th Cir. 2018). When a defendant raises qualified immunity as a defense, "the onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, *and* (2) that the

(continued...)

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation omitted). In making this assessment, this court "accept[s] as true all well-pleaded factual allegations in a complaint and view[s] these allegations in the light most favorable to the plaintiff." *Id.* (quotations omitted).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotation and citation omitted). To state a cognizable Eighth Amendment claim, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. The deliberate indifference test involves an objective and a subjective component. *Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018). The objective component requires the plaintiff to allege the

---

³(...continued)
right was clearly established at the time of the challenged conduct." *Cummings v. Dean,* 913 F.3d 1227, 1239 (10th Cir. 2019) (quotations omitted). This court may choose to address either of the two qualified-immunity requirements first because, if "the plaintiff fails to establish either prong of the two-pronged qualified immunity standard, the defendant prevails on the defense." *Id.* (quotation omitted). As set out below, this appeal can be fully resolved on the first requirement of the qualified-immunity inquiry.

deprivation at issue was sufficiently serious.  *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  That is, the defendant's actions "must result in the denial of the minimal civilized measure of life's necessities."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation omitted).  The subjective component requires the prisoner to allege the official was deliberately indifferent to a serious medical need.  *Id.*  A plaintiff sufficiently alleges a culpable mindset when the facts alleged show a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

The Estate's complaint fails to plausibly allege that Mohiuddin's actions resulted in the denial of necessary medical care to Davis or that Mohiuddin had a sufficiently culpable state of mind.  That conclusion is dictated by this court's decisions in, inter alia, *Pahls v. Thomas*, 718 F.3d 1210, 1225-28 (10th Cir. 2013), and *Robbins*, 519 F.3d at 1246-50.  These cases establish that the kind of collective and generalized allegations set out in the Estate's complaint are insufficient to overcome an assertion of qualified immunity at the motion-to-dismiss stage.  In particular,

> [t]o make out viable § 1983 . . . claims *and* to overcome defendants' assertions of qualified immunity, plaintiffs . . . must establish that each defendant—whether by direct participation or by virtue of a policy over which he possessed supervisory responsibility—caused a

-11-

> violation of plaintiffs' clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind. Plaintiffs must do more than show that their rights were violated or that defendants, as a collective and undifferentiated whole, were responsible for those violations. They must identify specific actions taken by particular defendants, or specific policies over which particular defendants possessed supervisory responsibility, that violated their clearly established constitutional rights. Failure to make this showing both dooms plaintiffs' § 1983 . . . claims and entitles defendants to qualified immunity.

*Pahls*, 718 F.3d at 1228 (citations and quotations omitted); *see also Robbins*, 519 F.3d at 1250 (holding "that a complaint must make clear exactly *who* is alleged to have done *what* to *whom*" so that each defendant has fair notice as to the basis of the claims against him); *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1160 (10th Cir. 2018) (citing *Pahls* and *Robbins*, along with other cases, for the proposition that in civil rights cases involving multiple defendants and the assertion of qualified immunity, the complaint must allege specific facts showing each defendant violated the defendant's clearly established constitutional rights).

Although some of the allegations set out in the complaint are, if true, disturbing and reprehensible, none of those allegations allege that Mohiuddin's actions violated Davis's constitutional rights. Indeed, Mohiuddin is barely mentioned in the complaint. Merely lumping Mohiuddin in with fifteen other medical professionals under the generic label "defendants" or "Corizon health care providers" does not adequately plead a § 1983 claim against him. *See Robbins*, 519 F.3d at 1250 ("Given the complaint's use of either the collective

-12-

term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."). Specifically, none of the seventy-five allegations common to all counts in the complaint name Mohiuddin or make clear exactly what he was alleged to have done or what he knew about Davis's condition at relevant points in time. In fact, it is not even plausible to read the complaint as asserting Mohiuddin had any involvement in Davis's care prior to the MRI on April 11, 2017.[4] Thus, it is simply impossible, even viewing the allegations in the complaint generously in favor of the Estate, to conclude Mohiuddin's actions, as opposed to the collective or individual actions of other named healthcare providers, violated Davis's Eighth Amendment right to be free from the denial of critical medical care.

Nor, standing alone as they do, can the allegations in paragraph 145 of the complaint support a deliberate indifference claim against Mohiuddin. Paragraph 145 merely asserts three doctors, specifically including Mohiuddin, "failed and

---

[4]The Estate's counsel admitted as much at oral argument. In response to questions from the bench, counsel asserted Mohiuddin was included in the complaint because Mohiuddin "treated Mr. Davis throughout the entire eight months, there are numerous entries in the medical record by Dr. Mohiuddin in regard to Mr. Davis." When asked, however, how the court "could tell that from the complaint," counsel responded: "Not sure if you can, your Honor."

refused to order immediate hospitalization" after a grossly abnormal MRI. The problem is that there are no allegations in the complaint allowing a court to even infer what role Mohiuddin, as opposed to the other two doctors, played in this decision. As noted above, the allegations in the complaint do not specifically indicate any personal involvement on the part of Mohiuddin in Davis's medical care prior to the MRI. Nor does the complaint explain how Mohiuddin was involved in the following actions: the decision on April 11th to conduct the MRI; the reading or evaluation of the MRI; and the decision, given the gross abnormality detected by the MRI, to return Davis to his cell. The complaint does not allege, and it is not possible to infer, that Mohiuddin was empowered, as opposed to the other two named doctors, to immediately send Davis out of the prison for emergency care. Indeed, while both Mohiuddin and Karl Saffo are merely described as licensed physicians employed by Corizon at HCF, the complaint describes Paul Corbier as the "Regional Medical Director for Corizon." As Regional Medical Director, Corbier allegedly "exercised final corporate decision-making authority over institutional medical policies and procedures." Again, the exceedingly limited and collective allegations in paragraph 145 do not plausibly plead an Eighth Amendment violation on the part of Mohiuddin. *See Matthews v. Bergdorf*, 889 F.3d 1136, 1144-45 (10th Cir. 2018) (relying on *Pahls* and *Robbins* to hold that once a defendant raises the defense of qualified

-14-

immunity, a presumption of immunity arises which the plaintiff must rebut by demonstrating the complaint's "factual allegations established [its] right to recover against *each*" defendant).

## IV. CONCLUSION

For those reasons set out above, the order of the United States District Court for the District of Kansas denying Mohiuddin's motion to dismiss is hereby **REVERSED** and the matter is **REMANDED** to the district court for further proceedings consistent with this opinion.