FILED
United States Court of Appeals
Tenth Circuit

July 6, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LEE HUNT, as personal representative of
the wrongful death Estate of Ariza
Barreras; GABRIELLE VALDEZ, as the
Guardian Ad Litem for T.B. and F.B.,
minor children,

     Plaintiffs - Appellees.

v.

LEAH MONTANO; GWENDOLYN
GRIFFIN; KIM CHAVEZ-BUIE;
MICHELLE HILL; LORA VALDEZ, all
in their personal capacities acting under
color of state law,

     Defendants - Appellants,

and

STEPHANIE CROWNOVER; THE NEW
MEXICO CHILDREN, YOUTH AND
FAMILIES DEPARTMENT,

     Defendants.

No. 20-2042

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:19-CV-00700-KWR-KRS)**
_____

Jerry A. Walz (Alisha L. Walz with him on the briefs), Walz and Associates, P.C.,
Albuquerque, New Mexico, for Defendants-Appellants.

Andrew G. Schultz, Rodey Dickason Sloan Akin & Robb, P.A. (F. Michael Hart and Kelly Stout Sanchez, Martinez, Hart, Thompson & Sanchez, P.C., and Bryan L. Williams, Williams Injury Law, P.C., with him on the brief), Albuquerque, New Mexico, for Plaintiffs-Appellees.

_____

Before **MATHESON**, **KELLY**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

This is an interlocutory appeal from the denial of a motion for judgment on the pleadings asserting qualified immunity. At issue is whether the special relationship doctrine exposes five employees of the New Mexico Children, Youth and Families Department ("CYFD") to liability arising from the abuse of two foster children, T.B. and F.B., and the death of a third foster child, Ariza Barreras. We agree with the district court that the children's representatives' allegations state a plausible claim that two of the CYFD employees—Leah Montano and Gwendolyn Griffin—violated the children's substantive due process rights. However, the district court erred by concluding that the other three employees—Kim Chavez-Buie, Michelle Hill, and Lora Valdez—committed a constitutional violation. The district court also erred by finding that the clearly established prong of qualified immunity had been waived for purposes of this motion. We reverse as to Chavez-Buie, Hill, and Valdez on the constitutional violation prong of qualified immunity because the complaint failed to allege liability under the special relationship doctrine. Chavez-Buie, Hill, and Valdez are therefore entitled to qualified immunity. We reverse as to Montano and Griffin on the clearly established prong of qualified immunity because, even though

we agree with the district court that the allegations state a claim under the special relationship doctrine, the district court incorrectly deemed the clearly established prong waived. We remand for a determination whether Montano and Griffin violated clearly established law.

## I.

### a.

The following facts are based on the allegations in the amended complaint. Ariza Barreras, T.B., and F.B. ("the children") were siblings. In May 2017, the children were transferred to CYFD's custody. At the time, Barreras was four months old, T.B. was two years old, and F.B. was one year old. CYFD employees Michelle Hill and Lora Valdez placed the children with foster parents Vanessa Dominguez and Justin Romero. They did so without evaluating whether Barreras and T.B., who were exposed to drugs in utero, "should have been treated and cared for as 'special needs' children and placed with foster parents who had received . . . additional training." App'x at 21. Dominguez and Romero had no experience as full-time foster parents for multiple children under the age of three with special needs. Hill and Valdez allegedly made this full-time placement even though Dominguez and Romero were licensed only as respite care providers.[1]

---

[1] Unlike full-time foster parents, respite care providers "care for foster children for short periods of time when the child's original foster parents are unable to provide care." App'x at 13.

Dominguez and Romero applied to be foster parents in 2016. At the time, they only sought to provide respite care. As part of the application process, La Familia, Inc.—an independent agency operating on CYFD's behalf—prepared an 18-page home study report. The report recommended that CYFD deny Dominguez and Romero a foster-parent license. La Familia's investigator found that Romero had a family history of schizophrenia, was neglected by his mother as a child, and had a history of deprivation and trauma. Romero also struggled to cope with the death of his wife; he removed all reminders of her from his home and refused to speak with his six-year-old daughter about her mother. The investigator concluded that Romero would not be able to focus on a foster child's emotional needs because he had not addressed his grief and had not helped his daughter cope with hers. The investigator submitted allegations of emotional abuse by Romero against his daughter to Child Protective Services.

CYFD employees Leah Montano and Gwendolyn Griffin looked into the emotional abuse accusations but could not substantiate them. Montano, Griffin, and fellow CYFD employee Kim Chavez-Buie prepared a one-page addendum to the La Familia home study, disagreeing with the investigator and finding that Dominguez and Romero could be appropriate caregivers. It was a "team decision that support[ed] overturning . . . the home study." *Id.* at 16. On July 11, 2016, CYFD issued Dominguez and Romero a license that was only for respite foster care. However, by May 2017, Dominguez and Romero began serving as full-time foster

parents. There is no record that CYFD ever relicensed them to provide full-time care.

As full-time foster parents to Barreras, T.B., and F.B., Dominguez and Romero regularly relied on respite care for the children, using such care approximately eleven times in eight months. Initially, Dominguez and Romero contacted Montano, who would arrange these placements—including several with Stephanie Crownover, who lived nearby. The children were in Crownover's respite care when Barreras died.

CYFD had licensed Crownover in 2016. Montano completed Crownover's home study, which Griffin approved. The study showed Crownover's spare bedrooms lacked necessary furniture for foster children, although she communicated her intention to buy beds. The study noted that her monthly income was $1,200 while her monthly expenses were roughly $1,060, which the evaluator called "barely enough to meet the family's needs." *Id.* at 17. According to the study, Crownover had a history of drug and alcohol abuse, associated with dangerous criminals, and maintained relationships with abusive men. Crownover had numerous traffic citations and had been arrested for conspiracy, aggravated battery, and battery against a family member. Crownover committed the latter against her six-year-old granddaughter with a broomstick because she did not wake up on time. CYFD investigated and substantiated that physical abuse allegation. CYFD also substantiated allegations in 2012 that Crownover failed to provide her granddaughter with adequate food and shelter, and emotionally abused her, as well as 2013 allegations that Crownover excessively and inappropriately disciplined her. The

5

home study findings were inconsistent with a questionnaire completed by Crownover a few months earlier, in which she denied that she had been the subject of an abuse investigation or had ever been arrested. These discrepancies were not identified or addressed by Montano or Griffin. Despite all this, CYFD licensed Crownover.

Crownover told CYFD that she was only interested in providing respite care for sibling groups of no more than two. Although Barreras, T.B., and F.B. were a group of three, Crownover regularly provided them respite care. After Montano coordinated the first few visits, Dominguez and Romero started contacting Crownover directly to arrange respite care "without CYFD's prior knowledge or approval." *Id.* at 23. Montano knew about and permitted this deviation from normal CYFD procedure, never telling Dominguez and Romero that it was improper.

After a two-night respite stay with Crownover in August 2017, CYFD received a report of physical abuse against T.B. and F.B. F.B. had bite marks on his arm and a black eye, while T.B.'s eye and arm were bruised. Hill and Valdez investigated. They could not substantiate the physical abuse allegations against Crownover because the children were too young to explain how they were hurt. Their investigative report indicated that a home visit was conducted and no safety threats were found. The home was "in good condition." *Id.* at 24.

Other foster families had problems with Crownover's respite care during this period. Foster children in her care were unkempt, lacking showers and presenting with matted hair. In one case, Crownover observed spots on a foster child's hands—which turned out to be hand, foot, and mouth disease—but failed to take the child to

6

the doctor and encouraged him to play, telling him he was not sick.  Various foster parents reported these incidents to Montano, but they are not recorded in CYFD files. Montano's notes do indicate that in November 2017, she had a conversation with Crownover to discuss an "incident" that was "unacceptable," "against policy," and warranted "some type of corrective action plan." *Id.* at 27.  Griffin's notes reference the incident too.  Their notes do not specify whether any plan was implemented. Griffin's notes—entered, like Montano's, en masse shortly after Barreras's death— report her satisfaction with Crownover's home throughout 2017, but fail to reflect whether she actually visited the home.

In October 2017, Crownover reported violence between T.B. and F.B. and told CYFD that she would no longer care for them together.  She cared for the siblings separately in November 2017.  But on December 28, 2017, Crownover once again accepted all three children for several days of respite care.  She told CYFD investigators in the aftermath of Barreras's death that, although she "knew she could not handle all three children at once, she hates telling people no." *Id.* at 29.  The next day, the children had a two-hour supervised visitation with their biological parents. The visitation monitor reported to CYFD that Crownover arrived late, Barreras's diaper had been soiled for over an hour, F.B. and Barreras had diaper rashes, and Barreras had dried feces on her buttocks and lower back.  There is no record that CYFD contacted Crownover about these observations or tried to investigate them.

Around this time, Barreras would usually sleep in a playpen or bed. Crownover told Dominguez that she had a bed for Barreras, so Dominguez would not

7

need to bring any bedding when she dropped off the children.  But Crownover did not have a bed.  On December 28, 29, and 30, Crownover strapped Barreras into a car seat on the floor to put her to sleep.  On the morning of December 31, 2017, Crownover discovered Barreras slumped forward in the car seat with her left arm caught in the shoulder strap.  She was not breathing.  The Office of the Medical Investigator pronounced her dead.

A law enforcement investigation showed that the outside temperature had fallen below freezing overnight, there were holes in the walls and ceiling, and the heater was not operational.  The investigation also found that Crownover's house did not have a crib or bed for Barreras, the floors were filthy, rotten food remained in the refrigerator and around the house, trash was stuffed under the beds, soiled clothing and diapers were stacked in the corners, dog feces and urine covered the floor, and human feces floated in the toilet.  Officers described the odor in the house as "intolerable." *Id.* at 32.  They described T.B. and F.B. as sick, soiled, and unbathed, with severe diaper rashes.

CYFD removed T.B. and F.B. from Crownover's home and opened an investigation.  It found they were in danger of serious harm from abuse or neglect.  It also found that Crownover did not have a strong emotional bond or positive attachment with them.  CYFD substantiated Crownover's physical neglect of Barreras, her inadequate shelter of all three children, and her physical abuse and neglect of F.B. related to a burn F.B. suffered in her care.  T.B. and F.B. "suffered physical injury, pain, emotional distress and severe mental anguish." *Id.* at 46.

8

**b.**

Lee Hunt, the personal representative of Barreras's estate, and Gabrielle Valdez, the guardian ad litem for T.B. and F.B. ("the children's representatives"), sued Crownover, CYFD, Montano, Griffin, Chavez-Buie, Hill, and Valdez in New Mexico state court under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act for violating the children's substantive due process rights. Crownover removed the case to the District of New Mexico.

The CYFD employees moved for judgment on the pleadings, asserting qualified immunity. The district court denied the motion. It determined the children's representatives plausibly alleged that each CYFD employee violated the children's substantive due process rights under the special relationship doctrine. However, the court did not determine whether the rights at issue were clearly established. The court opined that the CYFD employees "did not raise the clearly established prong of qualified immunity" in their motion, which had "solely argued that there was no constitutional violation." *Id.* at 199. The children's representatives "noted this in their response" and the employees "did not dispute this characterization of their argument in their reply brief." *Id.* The court concluded that the employees "waived, for this motion only, review under the clearly established prong." *Id.*

The CYFD employees appealed. They assert that the district court erred both by finding that the children's representatives adequately pled a Fourteenth Amendment substantive due process violation and by denying them qualified immunity without a showing that they violated clearly established law.

9

**II.**

"Qualified immunity protects governmental officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  We review de novo the district court's denial of the CYFD employees' motion for judgment on the pleadings asserting a qualified-immunity defense.  *Cummings v. Dean*, 913 F.3d 1227, 1238 (10th Cir. 2019).

To survive a motion for judgment on the pleadings based on qualified immunity, plaintiffs "must allege sufficient facts that show—when taken as true—the defendant plausibly violated [their] constitutional rights, which were clearly established at the time of violation." *Schwartz*, 702 F.3d at 579.  To determine whether a claim is plausible, we "accept as true 'all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.'" *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quoting *Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011)).

**III.**

We first address our jurisdiction to consider the CYFD employees' interlocutory appeal.  Under the collateral-order doctrine, a district court's denial of qualified immunity is immediately appealable to the extent the court's decision turns on an abstract question of law.  *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  "At this stage, however, we are not at liberty to review a district court's factual

10

conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008).

The CYFD employees present two questions on appeal. The first is whether the children's representatives' allegations plausibly show the violation of a substantive due process right. The second is whether the district court erred by denying qualified immunity where, in its view, the representatives "made no effort before the district court to meet their burden of demonstrating that the constitutional right at issue was clearly established." Aplt. Br. at 47. We have jurisdiction to consider these purely legal issues.

## IV.

Federal law authorizes a private cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution" under color of state law. 42 U.S.C. § 1983. The children's representatives' claims are rooted in the substantive component of the Fourteenth Amendment's Due Process Clause, which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. State actors like the CYFD employees, however, are generally not liable for "failure to protect an individual against private violence." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). One exception to this principle is the special relationship doctrine at issue here.

11

"A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).  We have recognized that foster care creates a special relationship.  *See Schwartz*, 702 F.3d at 580; *see also Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 892–93 (10th Cir. 1992).  "This special relationship triggers a continuing duty that is subsequently violated if a state official knew of the asserted danger to a foster child or failed to exercise professional judgment with respect thereto, and if an affirmative link to the injuries the child suffered can be shown." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238–39 (10th Cir. 2018) (cleaned up).  A state official's failure to exercise professional judgment requires something beyond mere negligence.  It requires an "abdication of professional responsibility . . . sufficient to shock the conscience." *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1143 (10th Cir. 2006).

We proceed to assess whether each individual CYFD employee violated the children's substantive due process rights under the special relationship doctrine.  *See Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018).  De novo review suggests the district court correctly found that Montano and Griffin could be liable if their alleged conduct violated clearly established law, but the district court erred with respect to Chavez-Buie, Hill, and Valdez.

**a.**

We start with the allegations against Montano and Griffin.[2]  We focus on the

allegations related to licensing and monitoring Crownover, which we conclude

amount to a conscience-shocking abdication of professional judgment by both

Montano and Griffin.[3]

We have previously held employees in similar roles could be liable for failing

to investigate foster homes.  In *Schwartz*, we found two county employees violated a

foster child's substantive due process rights when they "ignored known or likely

injuries and abuse to [the foster child], chose not to further investigate such possible

---

[2] The CYFD employees argue on appeal that the special relationship doctrine cannot apply to the decisions to license either Dominguez and Romero or Crownover because the children were not yet in state custody when those decision were made. The employees concede that they did not identify this issue before the district court. Even assuming they forfeited rather than waived this theory below, we decline to consider it now because they fail to argue plain error.  *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("If a newly raised legal theory is entitled to appellate review at all—if it wasn't waived before the district court—it may form a basis for *reversal* only if the appellant can satisfy the elements of the plain error standard of review.").  "The burden of establishing plain error lies with the appellant. In civil cases, this burden is 'extraordinary . . . [and] nearly insurmountable.'" *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1151 (10th Cir. 2012) (alterations in original) (quoting *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 802 (10th Cir. 2001)).  Thus, "the failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court." *Richison*, 634 F.3d at 1131.

[3] In finding a substantive due process violation by Montano and Griffin, we do not rely on the allegations about (1) their licensure of Dominguez and Romero and (2) their investigation into the reported emotional abuse of Romero's daughter.  Not only do the children's representatives state a claim against Montano and Griffin under the special relationship doctrine without regard to those allegations, but, as we discuss below in relation to Chavez-Buie, allegations about Dominguez and Romero have dispositive causation defects because they lack an "affirmative link" to the harm suffered by the children in Crownover's care. *See Yvonne L.*, 959 F.2d at 890.

abuse, and ignored the danger posed by his continued residence" in the home in which he was placed. 702 F.3d at 587. In *Johnson*, we determined that a CYFD employee may have abdicated her professional judgment when she allegedly failed to investigate circumstances surrounding a foster parent's removing the child from day care, firing the child's home health nurses, and inviting the parent's father to live in the foster home without informing CYFD. 455 F.3d at 1145. In *Matthews*, we deemed sufficient a plaintiff's allegations that a caseworker "'screened out' a referral that alleged the . . . foster home was dangerous and filthy, [a foster child] did not bathe frequently, his or her clothes were dirty, and preteen children of different sexes were sleeping in the same room." 889 F.3d at 1149. Comparing our precedents with the allegations against Montano and Griffin, we think that the children's representatives have alleged "enough facts to raise a reasonable expectation that discovery will reveal evidence that a constitutional violation has in fact occurred." *Id.*

Regarding the Crownover licensure, Montano and Griffin allegedly knew about Crownover's precarious financial situation, her alcohol and drug problems, her criminal history, her previous relationships with abusers, and her record of committing physical abuse herself—including a battery against her six-year-old granddaughter. Montano and Griffin had personal knowledge that Crownover's home lacked necessary beds and bedding. Nothing in the CYFD records showed that Montano or Griffin followed up on these red flags, or that they reconciled conflicting information Crownover provided to CYFD in a questionnaire. Once licensed,

Montano allegedly allowed Dominguez and Romero to independently arrange respite care with Crownover "without CYFD's prior knowledge, approval, or authorization." App'x at 23. That was inconsistent with CYFD policy. Montano was also allegedly aware that Crownover no longer wanted to care for T.B. and F.B. at the same time but did not intervene when the children continued to receive care from her.

The children's representatives alleged that, during this period, Montano had personal knowledge of complaints related to Crownover's ability to care for foster children but declined to investigate them or monitor her. Other foster parents reported to Montano that Crownover failed to provide adequate hygienic care and in one instance ignored a child's hand, foot, and mouth disease. Notes allegedly taken by Montano and Griffin mention an "incident" with Crownover that "was against policy" and "unacceptable," but did not lead to any response. *Id.* at 27. Nevertheless, the children's representatives alleged that Griffin repeatedly wrote in her notes throughout 2017 that there were "[n]o concerns noted with the Crownover home." *Id.* at 28.

Considering the allegations against Montano and Griffin, we think they abdicated their professional judgment with respect to the placement and monitoring of the children with Crownover. Not only did they allegedly approve a foster parent with a violent and dangerous history, but they failed to adequately monitor her home. Eschewing even the barest safeguards, Montano allegedly allowed the children's respite placement with her to be privately arranged in violation of CYFD policy. Montano and Griffin knew that Crownover did not want to take care of the children

15

together and had reason to think that she would not be capable of doing so. They even allegedly knew that she lacked essential items like beds and did not follow up to ensure that she obtained them. Barreras died when Crownover put her to sleep in a car seat in a filthy home without functional heating. The juxtaposition of Griffin's glowing notes about the state of the home and the appalling scene observed by first responders speaks volumes. Although Crownover is directly responsible for what happened to the children, it was allegedly only through Montano and Griffin that she was licensed to provide foster care and connected with the children in the first place. Neither Montano nor Griffin addressed any of the problems with Crownover to ensure her home was a safe and appropriate place to care for foster children. More than acting with "mere negligence," *see J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011), Montano and Griffin allegedly abdicated their professional responsibility in nearly every aspect of the children's placement with Crownover. Under the special relationship doctrine, that leaves only two questions: whether their alleged conduct caused the children's injuries and whether it shocks the conscience. We answer both questions in the affirmative.

We start with causation. Our cases require an "affirmative link" between the state actor's conduct and "the injuries . . . suffered" to impose special relationship liability. *Yvonne L.*, 959 F.2d at 890. That calls for something more than mere but-for causation or coincidence, especially where it is so important to evaluate the conduct of each employee claiming qualified immunity individually. *See Matthews*, 889 F.3d at 1144. We reject the children's representatives' position that but-for

16

causation is sufficient because it fails to engage with our precedents.  The issue with respect to causation is whether the special relationship doctrine's causation standard is met, so that the CYFD employees are responsible for the children's treatment by Crownover.  The children's representatives' arguments about whether the general causation standard for § 1983 liability is satisfied, while important to the merits, are irrelevant to whether qualified immunity was properly denied based on a constitutional violation under the special relationship doctrine.

There is an obvious "affirmative link" between the licensing and monitoring of Crownover and the injuries suffered by the children in her care.  *See Yvonne L.*, 959 F.2d at 890.  The children's representatives allege a host of risk factors ignored by Montano and Griffin in licensing Crownover, all of which were exacerbated by their failure to adequately monitor her.  When the children were placed in her care, these risks became real.  Barreras died while sleeping in a car seat; Montano and Griffin allegedly knew Crownover did not have a bed and never followed up.  T.B. and F.B. suffered physical harm in Crownover's home; Montano and Griffin allegedly knew that Crownover was an abuser who fraternized with abusers.  The children were harmed in Crownover's care, tragically but foreseeably, because of Crownover's conduct as a respite care provider.  That is an affirmative link under the special relationship doctrine, which leaves us to decide only whether her conduct shocks our conscience.

"Conscience-shocking behavior evades precise definition and evolves over time."  *Schwartz*, 702 F.3d at 586 (alteration and internal quotation marks omitted).

17

The test is not an exact science; it depends greatly on the circumstances. To satisfy this standard, the children's representatives must "do more than show that the government actor intentionally or recklessly caused injury . . . by abusing or misusing government power." *Uhlrig*, 64 F.3d at 574. They must show "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* Behavior under this standard is "viewed in total"—"the cumulative impression of [the] conduct should be considered." *Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001).

In *Currier*, we held that a caseworker's behavior could be conscience shocking where he allegedly failed to investigate bruises and abuse allegations and was in part responsible for a court's order granting legal custody to the father of two minor children despite knowing about the father's financial instability and the allegation of abuse against him. *Id.* In *Schwartz*, we held that two social workers behaved in a conscience-shocking manner by allegedly ignoring a foster child's known or likely injuries, choosing not to investigate possible abuse, and ignoring the danger posed by the child remaining with his foster parents. 702 F.3d at 587. In *Armijo v. Wagon Mound Public Schools*, we held that returning a suicidal special-education student to his home, where he had access to firearms and took his own life, was conscience-shocking behavior. 159 F.3d 1253, 1264 (10th Cir. 1998).

We agree with the district court that Montano and Griffin behaved in a manner that shocks the judicial conscience consistent with our earlier cases. Accepting the allegations in the complaint as true, Montano and Griffin licensed Crownover—and

18

Montano circumvented CYFD protocols to permit Barreras, T.B., and F.B. to be repeatedly placed in her care—despite her history of crime, past dangerous relationships, financial situation, alcohol and drug problems, and record of physical abuse against a child in her care. They knew Crownover's home lacked necessary beds and bedding but never followed up to make sure she purchased some before providing care. They allowed Crownover to care for the children even as CYFD investigated reports of abuse by Crownover against T.B. and F.B. The notes hastily entered after Barreras's death suggest a shocking degree of malfeasance when compared with the condition of the home in December 2017. Montano and Griffin consciously placed the children in a perilous environment and ignored signs of continued danger and abuse as time went on. Because of their conduct, toddlers T.B. and F.B. suffered physical abuse and lost their infant sister. Barreras lost her life. The "cumulative impression" of the conduct in this case is dismal and damning. *See Currier*, 242 F.3d at 920. The effects were devastating. The children's representatives have plausibly alleged that Montano and Griffin are responsible. If the allegations in the complaint are substantiated, their actions shock our conscience enough to impose liability under the special relationship doctrine.[4]

**b.**

---

[4] At this stage, we make all inferences in the children's representatives' favor. *See Schwartz*, 702 F.3d at 587. It is, of course, possible that "discovery may inform the context" of the CYFD employees' behavior such that the allegations in the complaint are undermined or unsubstantiated. *Id.* That does not render a denial of qualified immunity improper at this stage in the proceedings, just as it does not prejudice the renewal of a qualified-immunity claim at a later stage. *See id.*

Next, we discuss Chavez-Buie.  The only allegation against Chavez-Buie is that, along with Montano and Griffin, she summarily dismissed the La Familia home study recommending that CYFD deny Dominguez and Romero a foster care license. Chavez-Buie allegedly ignored the home study investigator's findings about Romero's history of trauma and neglect, and his inability to emotionally support his daughter in the wake of her mother's death.

Even if we agreed that the mere licensure of Dominguez and Romero demonstrated a conscience-shocking lack of professional judgment, we think that the children's representatives failed to plausibly allege the special relationship doctrine's causation element.  Sifting through the allegations against Chavez-Buie illustrates this theory's causal shortcomings.  At the outset, we disregard the children's representatives' conclusory allegations that the children's injuries were "direct[ly] and proximate[ly]," App'x at 43, caused by Chavez-Buie's conduct.  *See Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) ("Courts do not assume as true allegations that are legal conclusions, formulaic recitations of elements, or naked assertions devoid of further factual enhancement.").  Turning to the complaint's substance, we think that however questionable the certification of Dominguez and Romero could have been, there is no allegation that the children were harmed by them.  The complaint alleges that Barreras died, and T.B. and F.B. were harmed, in Crownover's respite care.  The children's representatives may note red flags related to Dominguez and Romero, but they do not allege—nor does it follow by any reasonable inference—that the CYFD employees were wrong to license Dominguez

20

and Romero because the couple would go on to seek respite care from another improperly licensed foster parent who would, in turn, harm the children. That makes little sense. Even inferring that Dominguez and Romero may have been more likely to seek respite care than other foster parents because that was all they originally sought to provide, and all they were licensed for, it remains unreasonable to assume from the complaint that respite foster care with licensed providers is inherently dangerous to foster children.

It is true that the children were allegedly placed with Crownover while they were in the full-time custody of Dominguez and Romero. But without any plausible allegations from which we can infer causation, that does not mean Dominguez and Romero are automatically to blame. Chavez-Buie's relevant conduct was limited to licensing Dominguez and Romero despite La Familia's concerns. For purposes of applying the special relationship doctrine, her actions have nothing to do with what happened to the children in any legally relevant sense. Even assuming the other elements of the special relationship doctrine are satisfied, there is no affirmative link between the children's harms and their placement with Dominguez and Romero. Chavez-Buie is entitled to qualified immunity.

**c.**

Finally, we consider the allegations against Hill and Valdez, which fall into two categories: (1) placing the children with Dominguez and Romero, and (2) failing to substantiate abuse allegations against Crownover in August 2017.

First, our discussion of the licensure of Dominguez and Romero applies directly to the children's placement in their home by Hill and Valdez. Even assuming that the placement was a conscience-shocking abdication of professional judgment, it did not cause the children's injuries at Crownover's hand in any meaningful sense. The allegations about the failure by Hill and Valdez to consider the children's special needs, while concerning, are likewise inapposite. Without an affirmative link between the alleged misconduct and the harm suffered, the special relationship doctrine does not apply. *See Yvonne L.*, 959 F.2d at 890.

Second, regarding the Crownover abuse investigation, subsequent dissatisfaction with the result of a formal inquiry does not mean, without more, that Hill and Valdez failed to exercise their professional judgment in conducting that inquiry. Our cases support liability under the special relationship doctrine where social workers fail to investigate reported abuse entirely. *See Schwartz*, 702 F.3d at 587. They do not support liability where social workers' professional judgment leads them to a finding that, in retrospect, may strike us as suspect. *See Johnson*, 455 F.3d at 1144 ("That two professionals both conducted an investigation and simply disagreed about a diagnosis is not proof, in and of itself, that either professional has abandoned her professional judgment."). The children's representatives' allegations reference an "investigation report" that in turn referenced a favorable "home visit" conducted by Hill and approved by Valdez. App'x at 24. Without any allegation that the August 2017 investigation by Hill and Valdez was a sham or otherwise unprofessional, it is unreasonable to conclude or infer as much, especially when the

22

allegations about the home's sordid condition are set several months later. That leaves no basis for finding that Hill or Valdez abandoned their professional judgment. *See Johnson*, 455 F.3d at 1143–44. The allegations suggest that Hill and Valdez investigated, but failed to substantiate concerns of, reported abuse. Hill and Valdez are entitled to qualified immunity.

* * *

We hold that the children's representatives plausibly alleged that Montano and Griffin violated the children's substantive due process rights under the special relationship doctrine. But the complaint falls short for Chavez-Buie, Hill, and Valdez.

## V.

Proving that the CYFD employees violated a constitutional right is not enough to defeat their assertion of qualified immunity. The children's representatives must also demonstrate "that the right was clearly established at the time of the challenged conduct." *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (internal quotation marks omitted). To do so, plaintiffs do "not have to show that the specific action at issue had been held unlawful, but the alleged unlawfulness of the defendant[s'] conduct must be apparent in light of preexisting law." *Armijo*, 159 F.3d at 1260. This inquiry typically requires plaintiffs either to identify an on-point Supreme Court or Tenth Circuit decision establishing the unlawfulness of the alleged conduct, or to prove that the clearly established weight of authority from other courts supports the

23

plaintiffs' assertions about the state of the law. *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019).

The court below declined to consider whether the children's representatives met their burden of proving the law was clearly established. The court found the prong was not material to its decision because the CYFD employees "waived, for this motion only, review under the clearly established prong." App'x at 199. According to the district court, the employees had temporarily waived review because they "did not raise the clearly established prong" when they asserted qualified immunity. *Id.* But that is not how qualified immunity works.

The district court was wrong to find the clearly established prong waived because doing so erroneously shifted the children's representatives' burden to the CYFD employees. *See Estate of Vallina v. Petrescu*, 757 F. App'x 648, 651 n.1 (10th Cir. 2018) (unpublished).[5] When a § 1983 defendant raises qualified immunity, as the employees did in their motion for judgment on the pleadings, the burden shifts to the plaintiff to establish both prongs of the defense. *See Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015). Even if the CYFD employees failed to argue the clearly established prong in detail, as here, the children's representatives still bore the burden to demonstrate that it was met. The district court's provisional denial of qualified immunity, which sought to reserve the clearly established prong for later decision, was therefore improper. The CYFD employees could not waive,

---

[5] Unpublished cases are not binding precedent, but we consider them for their persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

temporarily or not, the very defense that they asserted as grounds for judgment on the pleadings.

We remand for the district court to conduct the clearly established inquiry in the first instance. *See Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 649 (10th Cir. 2017); *see also Kerns v. Bader*, 663 F.3d 1173, 1182 (10th Cir. 2011) (Gorsuch, J.) ("[R]emanding the matter back to the district court to finish the work of answering the . . . qualified immunity question . . . bears the advantage of allowing the adversarial process to work through the problem and culminate in a considered district court decision, a decision that will minimize the risk of an improvident governing appellate decision from this court."). The issue of whether the law is clearly established with respect to the conduct of Montano and Griffin, although a legal determination based on existing precedent, was only minimally briefed by the parties on appeal and was barely briefed below. It was also unaddressed by the district court. Now that we have clarified the specific constitutional violation by Montano and Griffin that the children's representatives have plausibly alleged under the special relationship doctrine, we think the clearly established prong is best addressed at the district court level as an initial matter. *See Workman v. Jordan*, 958 F.2d 332, 337 (10th Cir. 1992) ("[A]s a general rule, a federal appellate court does not consider an issue not passed upon below.").

## VI.

We REVERSE the district court's order denying qualified immunity to Montano, Griffin, Chavez-Buie, Hill, and Valdez. The complaint failed to plead a

25

constitutional violation by Chavez-Buie, Hill, or Valdez, so they are entitled to qualified immunity. Although the complaint plausibly pleaded a constitutional violation by Montano and Griffin under the special relationship doctrine, the district court erred by denying them qualified immunity on the basis that they waived the clearly established prong. Whether Montano and Griffin are entitled to qualified immunity depends on whether their conduct violated clearly established law, which the district court must determine in the first instance. We REMAND for further proceedings consistent with this opinion.